Mark Punzalan (State Bar No. 247599)
Email: mark@chanpunzalan.com
A. Chowning Poppler (State Bar No. 272870)
Email: chowning@chanpunzalan.com
Jin Im-Saeteurn (State Bar No. 266810)
Email: jin@chanpunzalan.com
Lawrence Ng (State Bar No. 328082)
Email: lawrence@chanpunzalan.com
CHAN PUNZALAN LLP
22 Battery Street, Suite 401
San Francisco, CA 94111
Telephone: 650.362.4150

*Counsel for Defendants*
*JadooTV, Inc. and Sajid Sohail*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DISH NETWORK L.L.C.,<br><br>      Plaintiff,<br><br>  vs.<br><br>JADOOTV, INC. and SAJID SOHAIL,<br><br>      Defendants. | Case No. 3:20-cv-01891-CRB<br><br>**DEFENDANT SAJID SOHAIL'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date: April 21, 2023<br>Time: 10:00 am<br>Dept: Courtroom 6, 17th Floor<br>Judge: Hon. Charles R. Breyer |

**TO PLAINTIFF AND ITS COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on April 21, 2023, at 10 a.m. or as soon thereafter as the matter may be heard, Defendant Sajid Sohail ("Defendant") will move, and hereby move, for summary judgment on Plaintiff DISH Network LLC's ("Plaintiff") Complaint, or in the alternative, summary adjudication. This motion will be heard in the courtroom of the Honorable Charles J. Breyer, located in the United States Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, Courtroom 6.

This Motion is made upon the ground that there are no genuinely disputed issues of material fact and Defendants are entitled to judgment as a matter of law on each claim and issue on which it has moved. First, Defendant seeks summary judgment on Count I for direct copyright infringement because there is no genuine issue as to any material fact that Defendant authorized or participated in any infringement. Second, Defendant seeks summary judgment on Count II for contributory infringement because there is no genuine issue as to any material fact that Defendant materially contributed to or actively induced any infringement. Third, Defendant seeks summary judgment on Count III for vicarious infringement because there is no genuine issue as to any material fact that Defendant directly profited from the infringement or had the right and ability to supervise third party infringers.  Alternatively, Defendant seeks summary adjudication as follows: (a) on Count I for direct infringement because the undisputed facts show Defendant was not actively and consciously behind any infringement; (b) on Count II for contributory infringement because the undisputed facts show Defendant did not substantially assist with or magnify any infringement; and/or (c) on Count III for vicarious liability because Defendant received no direct financial benefit from any infringement and Defendant had no ability to unilaterally identify and remove content by third party infringers.

This Motion is based on this Notice of Motion; the attached Memorandum of Points and Authorities; the Declarations of Counsel A. Chowning Poppler, Sajid Sohail, and Ahsan Salahuddin filed concurrently herewith; all of the pleadings, files, and records in this proceeding, all other matters of which the Court may take judicial notice; and any argument or evidence that may be presented to or considered by the Court prior to its ruling.

Dated:  March 13, 2023                    CHAN PUNZALAN LLP
                                          */s/ Chowning Poppler*
                                          Chowning Poppler
                                          Mark Punzalan
                                          Jin Im-Saeteurn
                                          Lawrence Ng

                                          *Counsel for Defendants*
                                          *JadooTV, Inc. and Sajid Sohail*

NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT SAJID SOHAIL'S MOTION FOR SUMMARY JUDGMENT

TABLE OF CONTENTS

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ..................................................... 1

II.   FACTUAL AND PROCEDURAL BACKGROUND .......................................................... 3

    A.    JADOOTV'S INCEPTION IN 2008 .......................................................................... 3

    B.    DISH'S ANTICOMPETITIVE CAMPAIGN AGAINST JADOOTV ................................ 4

    C.    JADOOTV'S EFFORTS TO ADDRESS DISH'S CONCERNS REGARDING EMEDIA & VIDEO-ON-
DEMAND (VOD) FEATURES ............................................................................... 6

    D.    DISH FILES SUIT & TAKES AIM AT JADOOTV'S CEO SAJID SOHAIL ................... 7

    E.    JADOOTV'S LAST-DITCH EFFORT TO APPEASE DISH ........................................ 11

    F.    DISH'S CONDUCT PUSHES JADOOTV INTO BANKRUPTCY ................................. 12

III.  LEGAL STANDARD ..................................................................................................... 12

IV.   ARGUMENT ................................................................................................................... 13

    A.    MR. SOHAIL IS ENTITLED TO SUMMARY JUDGMENT ON COUNT ONE FOR DIRECT COPYRIGHT
INFRINGEMENT BECAUSE HE DID NOT AUTHORIZE OR PARTICIPATE IN THE INFRINGEMENT. ..... 13

    B.    SUMMARY JUDGMENT SHOULD BE GRANTED ON COUNT TWO FOR CONTRIBUTORY
COPYRIGHT INFRINGEMENT ............................................................................. 19

    C.    MR. SOHAIL IS ENTITLED TO SUMMARY JUDGMENT ON COUNT THREE FOR VICARIOUS
LIABILITY ......................................................................................................... 21

V.    CONCLUSION ................................................................................................................ 23

NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT SAJID SOHAIL'S MOTION FOR SUMMARY JUDGMENT

1

TABLE OF AUTHORITIES

2

C<span>ASES</span>

3

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 249-50 (1986) ................................................................... 13

4

5

*Carson v. Verismart Software*,
2012 WL 1038662, at *5 (N.D. Cal. Mar. 27, 2012) ............................. 13, 14

6

*Celotex Corp. v. Catrett*,
477 U.S. 317, 322 (1986) ........................................................................ 13

7

8

*Davis v. Metro Prods., Inc.*,
885 F.2d 515, 524 (9th Cir. 1989) .................................................. 2, 13, 14

9

10

Ellison v. Robertson,
357 F.3d 1072, 1076 (9th Cir. 2004) ...................................................... 21

11

12

*Erickson Prods., Inc. v. Kast*,
921 F.3d 822, 831 (9th Cir. 2019) .......................................................... 19

13

Florentine Art Studio, Inc. v. Vedet K. Corp.,
891 F. Supp. 532, 539 (C.D. Cal. 1995) ................................................. 17

14

15

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
76 F.3d 259, 263 (9th Cir. 2001) ............................................................ 21

16

17

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*,
658 F.3d 936, 943 (9th Cir. 2011) ...................................................... 3, 19

18

19

Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,
545 U.S. 913, 930 .............................................................................. 3, 21

20

*Mon Cheri Bridals, LLC v. Cloudflare, Inc.*,
No. 19-CV-01356-VC, 2021 WL 4572015, at *1 (N.D. Cal. Oct. 6, 2021) .................. 20

21

*Nissan Fire & Marine Ins. CO. v. Fritz Companies, Inc.*,
210 F.3d 1099, 1106 (9th Cir. 2000) ...................................................... 13

22

23

Perfect 10, Inc. v. Amazon.com, Inc.,
508 F.3d 1146, 1175 (9th Cir. 2007) ...................................................... 20

24

25

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,
494 F.3d 788, 795 (9th Cir. 2007) .................................................... 19, 22

26

27

*VHT, Inc. v. Zillow Grp., Inc.*,
918 F.3d 723, 731 (9th Cir. 2019) ................................................ 14, 15, 22

28

NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT SAJID SOHAIL'S MOTION FOR SUMMARY JUDGMENT

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     INTRODUCTION AND SUMMARY OF ARGUMENT

Defendant Sajid Sohail founded Defendant JadooTV, Inc., in 2008 and has served as the company's CEO since then. JadooTV is a company that innovated Internet-based multicultural media, and the company's main product is a set-top box that streams entertainment primarily from South Asian cultures. In particular, JadooTV's set-top box, and its associated apps, allow audiences across the world to watch television, movies, and music originating from India, Pakistan, Bangladesh, Afghanistan and the Middle East.

In 2015, Plaintiff DISH Network L.L.C. ("DISH") launched its own Internet-based streaming service and called it SlingTV. Leading up to and after launching SlingTV, DISH embarked on an aggressive campaign to lock channels into exclusive agreements with DISH, including some of the South Asian-based channels that JadooTV had agreements with and had streamed since its inception. In addition to interfering with JadooTV's pre-existing agreements, DISH surreptitiously monitored JadooTV's operations for years. Starting around 2014, DISH began contacting retailers who sold JadooTV's set-top boxes and interfered with JadooTV's relationships with those resellers.

In 2016, as part of its ongoing bellicose campaign, DISH began contacting JadooTV accusing it of violating copyright laws for streaming South Asian content for which it had exclusive rights. Although JadooTV disputed DISH's accusations of infringement, JadooTV, and its CEO Mr. Sohail, took DISH's allegations seriously and attempted to address all of DISH's concerns. With no obligation to do so, JadooTV explained to DISH how the applications on its set-top boxes, namely, eMedia, VOD, and LiveTV worked. Much of the content DISH took issue with was not within JadooTV's control because it was added by third parties and JadooTV did not have control over that content.  To the extent JadooTV had control over the content and DISH adequately identified it, JadooTV removed the material. JadooTV engaged with DISH for years to show that if any innocuous infringement had potentially occurred, JadooTV would take action to stop it. JadooTV went so far as to engage a team of engineers in Pakistan who spent months developing and implementing a software patch to filter the eMedia content DISH was

1    concerned about. And when that software was not foolproof, JadooTV disabled its eMedia

2    application altogether.

3        In spite of JadooTV's efforts, DISH was (and is) hellbent in forcing JadooTV out of

4    business. In November 2018, DISH filed the present suit against Defendant JadooTV. Around

5    the same time period, DISH also filed a patent infringement suit against JadooTV in the Northern

6    District of California.[1] Due to losses in its retail sales and exorbitant legal fees JadooTV incurred

7    in defending against these two suits (and responding to DISH numerous letters from 2016 to

8    2018), JadooTV was forced to enter into Chapter 11 bankruptcy on May 31, 2019.[2]

9        Today, after seven years of legal disputes with DISH, it is abundantly clear to JadooTV that

10   DISH coveted (and still covets) JadooTV's innovation in providing Internet-based multicultural

11   media to JadooTV's customers. At every turn, DISH has sought to destroy JadooTV's business

12   by any means necessary. Indeed, since 2018, DISH has engaged in scorched-earth litigation

13   tactics against JadooTV, even though the company was in bankruptcy and financial distress.

14       Moreover, despite Mr. Sohail's own good faith efforts to work with DISH, DISH filed a First

15   Amended Complaint in the present action against Mr. Sohail individually, claiming that Mr.

16   Sohail was directly, contributorily, and vicariously liable for copyright infringement. However,

17   there is no evidence of direct, contributory, or vicarious infringement by Mr. Sohail, and

18   summary judgment should be granted in favor of Mr. Sohail against DISH.

19       First, Mr. Sohail is entitled to summary judgment on DISH's first cause of action for direct

20   copyright infringement. The evidence shows that Mr. Sohail did not authorize or participate in

21   any alleged infringement, and there is no evidence that Mr. Sohail was a "central figure" behind

22   any alleged infringement. *Davis v. Metro Prods., Inc.*, 885 F.2d 515, 524 (9th Cir. 1989). Mr.

23   Sohail selected JadooTV's management team with specific expertise and delegated duties to

24   oversee the content and engineering aspects of the business.

25

26

27   [1] This patent infringement suit was settled on May 28, 2021.

28   [2] JadooTV recently agreed to dismiss the Chapter 11 case on February 2, 2023.

NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT SAJID SOHAIL'S MOTION FOR SUMMARY JUDGMENT

1  Moreover, to hold Mr. Sohail liable for direct copyright infringement, DISH would have

2  to show that Mr. Sohail acted with volition to infringe on what DISH self-servingly calls

3  "protected channels." Here, although DISH claims that Mr. Sohail directed the infringement of

4  DISH through the eMedia app, the evidence shows that JadooTV did not have control what users

5  downloaded on the EMedia app. Further, Mr. Sohail went to the extraordinary lengths to have

6  JadooTV completely disable the app, which negates any showing of volition to infringe on any

7  copyrightable content. Given Mr. Sohail's efforts to minimize any potential infringement, DISH

8  has no proof that supports its claim for direct infringement against Mr. Sohail.

9  Summary judgment is also warranted for DISH's second cause of action for contributory

10 copyright infringement. To prove contributory infringement, DISH would have to show that Mr.

11 Sohail substantially assisted in the alleged direct infringement. *Louis Vuitton Malletier, S.A. v.*

12 *Akanoc Solutions, Inc*., 658 F.3d 936, 943 (9th Cir. 2011). But the evidence shows that DISH

13 cannot make this showing. Rather, the evidence shows that Mr. Sohail created the JadooTV set-

14 top box and applications for legitimate business purposes, and the only substantial assistance Mr.

15 Sohail actually provided was to help stop any potential infringement.

16 Finally, Mr. Sohail is entitled to summary issue for DISH's third cause of action for

17 vicarious liability. Mr. Sohail did not reap a financial benefit from any alleged infringement, and

18 he did not have the unilateral ability to stop any alleged infringement from third parties. *Metro-*

19 *Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930.

20 Here, even after four and a half years of scorched-earth litigation by DISH, there is no

21 genuine issue as to any material fact that Mr. Sohail is not liable for copyright infringement. As

22 such, Mr. Sohail respectfully requests that grant summary judgment for all causes of action

23 against him.

24 **II.      FACTUAL AND PROCEDURAL BACKGROUND**

25 **A.  JadooTV's Inception in 2008**

26 JadooTV, Inc. ("JadooTV") was created in 2008 to bring South Asian and multicultural

27 television, movies, and music to audiences from India, Pakistan, Bangladesh, Afghanistan and

28 the Middle East. Declaration of Sajid Sohail ("Sohail Decl.") at ¶7. JadooTV set out to reach its

1  multicultural audiences through Internet-based platforms and applications and offered its

2  services at affordable prices. *Id.* This was a paradigm shift away from cumbersome satellite

3  systems toward a more nimble and cost-effective system: all a customer needed was a good

4  internet connection to upload content and a good network to download and play content

5  inexpensively using a JadooTV set-top box. *Id.* at ¶8.  JadooTV's founder and Chief Executive

6  Officer, Sajid Sohail, was inspired to start the company because there was a lack of viable media

7  options for the South Asian community who wanted to stay connected with their culture. *Id.* at

8  ¶7.  Mr. Sohail had moved to the U.S. from Pakistan at the age of 19, and he wanted his

9  daughters, who were growing up in the U.S., to have access to their Pakistani heritage and

10  language. *Id.* Indeed, Mr. Sohail started JadooTV as a family enterprise, and his company sought

11  to reach the South Asian diaspora with the motto "connecting you to your culture." *Id.* With

12  JadooTV, Mr. Sohail created a business to benefit both his home country of Pakistan and his

13  adopted country in the U.S. *Id.*

14  **B.  DISH's Anticompetitive Campaign Against JadooTV**

15  JadooTV entered the Internet-based streaming market long before DISH Network L.L.C.

16  ("DISH") launched its online television service Sling TV in 2015. Sohail Decl. at ¶¶8, 22.

17  JadooTV had a myriad of agreements with channels (including channels DISH alleges are

18  "Protected Channels") to stream programs though JadooTV's Internet-connected box. *Id.* at

19  ¶¶22, 23. But once DISH decided to expand its satellite program offerings to Internet-based

20  streaming, DISH began interfering with JadooTV's pre-existing agreements with channels. *Id.* at

21  ¶23; Deposition of Ahsan Salahuddin ("Salahuddin Depo.") at 29:23-31:7 (After JadooTV had

22  an established agreement with HUM, DISH entered into an exclusive agreement with HUM)[3];

23  Dunya TV Agreement with DISH from July 2012 (Section 5 states that Dunya "will not be

24  available via the Jadoo website or any successor or replacement thereof")[4].

25

26

27  [3] Salahuddin Depo. attached as **Exhibit 1** to the Declaration of Chowning Poppler ("Poppler Decl.").

28  [4] Dunya TV Agreement attached as **Exhibit 3** to the Poppler Decl.

4

1   Instead of engaging in good faith competition and offering competitive pricing to

2   consumers, DISH embarked on a mission to eliminate its competition by demanding that

3   channels enter into exclusive agreements with DISH. Sohail Decl. at ¶23. In addition to

4   interfering with JadooTV's pre-existing agreements, DISH engaged in an unrelenting multi-year

5   campaign to surreptitiously monitor JadooTV's operations. *Id.* at ¶24. DISH's Senior Vice

6   President of International Business at DISH, Christopher Kuelling, was regularly receiving

7   reports about JadooTV set top boxes and licensing agreements.[5]

8   As part of this campaign, DISH began contacting and interfering with JadooTV's

9   relationship with retailers who sold JadooTV's set-top boxes starting in 2014. Declaration of

10  Ahsan Salahuddin ("Salahuddin Decl.") at ¶8; Salahuddin Depo. at 82:7-84:10 (**Ex. 1** to Poppler

11  Decl.). In 2014, All-Star Wholesales informed JadooTV's Vice President of Sales, Ahsan

12  Salahuddin, that as part of its settlement with DISH related to a Satellite Dream Box, All-Star

13  Wholesales could no longer sell JadooTV set top boxes. Salahuddin Decl. at ¶¶9-10. Although

14  Satellite Dream Boxes had nothing to do with JadooTV's set top boxes, DISH made All-Star

15  Wholesales stop selling any JadooTV product and also surrender to DISH any unsold JadooTV

16  product in its possession. All-Star Wholesales was only prevented and restricted him from selling

17  JadooTV products and not any other IPTV devices. *Id.* ¶10.  Two other retailers, Goyal Group

18  and Family Phone, were sued by DISH related to selling ShavaTV devices. *Id.* ¶¶11, 12.

19  Although ShavaTV had nothing to do with JadooTV's set top boxes, Goyal Group and Family

20  Phone, were required to stop selling JadooTV devices as part of their settlements with DISH. *Id.*

21  DISH also intimidated JadooTV's retailers with cease-and-desist letters and subpoenas.

22  Salahuddin Decl. at ¶¶13-15. Many of JadooTV's retailers received cease-and-desist letters from

23  DISH regarding selling ShavaTV devices in March 2017, even though the retailers did not sell

24  any ShavaTV devices. *Id*. at ¶¶13-14. Mr. Salahuddin emailed Mr. Sohail in April 2017

25  concerned that DISH was sending these letters to JadooTV retailers as a scare tactic. **Ex. 2** to

26  Poppler Decl. In 2019, DISH sent 60 subpoenas to JadooTV retailers in California and

27

28  [5] Emails from 2015 and 2016 to Mr. Kuelling are attached as **Exhibits 4, 5, and 6** to the Poppler Decl.

approximately 150 subpoenas to retailers in other states. *Id.* at 15. Between the litigation, settlement agreements, threatening letters and subpoenas from DISH, all of this resulted in JadooTV losing significant sales and revenue from retailers. *Id.* at ¶¶8-16.

### C.  JadooTV's Efforts to Address DISH's Concerns regarding eMedia & Video-on-Demand (VOD) Features

As part of its anticompetitive strategy, DISH began contacting JadooTV in or around 2016 claiming that it had exclusive rights to South Asian content that was available through JadooTV's eMedia application and video-on-demand ("VOD") features. Sohail Decl. at ¶25. Between 2016 and 2019, JadooTV engaged in numerous communications with DISH explaining how its set-top boxes operated and how JadooTV was not responsible for any copyright infringement.[6]

JadooTV's communications to DISH explained the eMedia, VOD, and LiveTV features of its set-top boxes. Sohail Decl. at ¶25. EMedia was an application that JadooTV released in 2015 and it allowed users to add content to their devices from the Internet or from external media devices.[7]  Sohail Decl. at ¶14. The head of engineering in Pakistan, Faisal Abdullah, developed and implemented all software applications, including eMedia, with a team of approximately 20 software engineers. *Id.* JadooTV believed eMedia would be a useful feature to add to Jadoo4 and Jadoo5 boxes because the company received many requests to add content to the platform, but as a small company, there were not enough people to manage all of the requests to add content. *Id.* The concept behind eMedia was to allow content owners to create and add content to JadooTV's platform worldwide. *Id.* Providing eMedia made the platform Open. Implementation of eMedia was completely in the hands of the engineering team in Pakistan and they determined XML files would be used to add content to JadooTV and that it would be hosted on GitHub, a website and cloud-based service.  *Id.*

---

[6] JadooTV's responses to DISH between 2016 and 2019 are attached as **Exhibits A, B, C, and D** to the Sohail Decl.

[7] JadooTV's boxes are manufactured and distributed without content in the eMedia application. Refurbished boxes that are resold may have content in the eMedia application that the prior user added. Sohail Decl. at ¶16.

NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT SAJID SOHAIL'S MOTION FOR SUMMARY JUDGMENT

1    In 2016, DISH demanded that JadooTV block certain channels from appearing in

2    eMedia. Sohail Decl. ¶26. JadooTV explained, among other things, that content on eMedia was

3    device-specific and that JadooTV did not have access, control or knowledge of what content a

4    particular user added to the eMedia section of the device.  *Id.* ¶27; **Ex. B** to Sohail Decl.

5    Nonetheless, Mr. Sohail inquired with JadooTV's engineering team in Pakistan to determine if

6    certain content could be blocked in eMedia. Sohail Decl. ¶¶26, 27.  But JadooTV's engineering

7    team informed Mr. Sohail that this would be practically impossible because JadooTV had no

8    control over the content customers added to their boxes and the company did not track that

9    information. *Id.*

10    As for VOD content that DISH took issue with, JadooTV explained in writing to DISH

11    that it provided VOD content through bookmarks to content that was hosted by third-parties on

12    the Internet, including from publicly available links from YouTube and Dailymotion. Sohail

13    Decl. ¶¶20, 28; **Exs. A and B** to Sohail Decl. This VOD content was neither hosted on

14    JadooTV's servers nor copied to its servers. Sohail Decl. ¶ 28. In addition, JadooTV had no

15    incentive to encourage consumers to view what DISH called "protected" content, because

16    JadooTV did not charge users for viewing the third-party content, and JadooTV did not generate

17    any advertising revenue from users viewing the bookmarked VOD content. *Id.* at ¶29. Moreover,

18    any advertisement that was embedded in the bookmarked VOD content was provided by the

19    website hosting the content, not by JadooTV. Sohail Decl. ¶29.

20    To the extent DISH identified material that JadooTV's content and engineering teams in

21    Pakistan were able to identify and were able to confirm that it was within JadooTV's control,

22    JadooTV removed that content at DISH's request. Sohail Decl. ¶30; **Ex. A** to Sohail Decl.

23    JadooTV's ongoing efforts to appease DISH were explicitly conveyed to DISH in written

24    correspondence. **Exs. A-C** to Sohail Decl.

25    **D.  DISH Files Suit & Takes Aim at JadooTV's CEO Sajid Sohail**

26    Despite JadooTV's extraordinary efforts to comply with DISH's demands, DISH filed the

27    present lawsuit on November 20, 2018 in the United States District Court for the Central District

28

NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT SAJID SOHAIL'S MOTION FOR SUMMARY JUDGMENT

of California.[8] In its operative complaint[9], DISH alleges that Mr. Sohail is individually liable for copyright infringement because of his role as CEO and a "technologist." ECF No. 194 at ¶¶9, 19. The allegations against Mr. Sohail include that he:

- designed the Jadoo service to directly stream unlicensed television channels through the Jadoo branded set-top box. *Id.* at ¶2.

- changed the way JadooTV offered channels by requiring users to download extra software files to their Jadoo set-top boxes and mobile apps to integrate those channels. *Id.*

- directed or authorized or ratified, selected, sourced and transmitted the Protected Channels. *Id.* at ¶¶4,58.

- personally made the decision for JadooTV to transmit the Protected Channels based on their popularity among viewers and the prospect that they would drive sales. *Id.* at ¶18.

- made the conscious decision to continue to transmit the Protected Channels. *Id.*

- "well aware" that DISH holds the exclusive rights to distribute and publicly perform the Protected Channels in the United States. *Id.* at ¶76.

- directed or authorized or ratified Haseeb Shah to transmit copyrighted programs from computer servers controlled by Shah to JadooTV users. *Id.* at ¶89.

- personally benefited from JadooTV's infringing conduct. *Id.* at ¶92.

- directed or authorized or ratified JadooTV instructing Jadoo Users having Jadoo4 and Jadoo5 set-top boxes and mobile apps on how to manually locate and install software files needed to integrate the Protected Channels, into the eMedia and Live TV menus of the set-top box and mobile app, thereby enabling the Jadoo Users to access the Protected Channels. *Id.* at ¶99.

- directed or authorized or ratified JadooTV advertising Jadoo set-top boxes and mobile apps as a means of accessing the Protected Channels and the programs that make up the Protected Channels. *Id.* at ¶100.

---

[8] The matter was transferred to the Northern District of California on March 16, 2020.
[9] DISH's First Amended Complaint ("FAC")(ECF No. 194).

NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT SAJID SOHAIL'S MOTION FOR SUMMARY JUDGMENT

- directed or authorized or ratified Jadoo TV maintaining and controlling the links or bookmarks that are used to connect Jadoo Users to the programs that make up the Protected Channels using the VOD menu of the Jadoo set-top box and mobile app. *Id.* at ¶100.

- provided material assistance to those directly infringing DISH's exclusive rights by providing technical information or assistance necessary for Protected Channel channels to be viewed on a Jadoo set-top box and mobile app. *Id.* at ¶102.

After more than after more than four and a half years of contentious litigation, the discovery in this case has shown these allegations to be without support. As discussed at length above, Mr. Sohail did not design JadooTV to stream unlicensed content, it was designed to connect the South Asian diaspora. Sohail Decl. ¶7. Mr. Sohail was not directly involved in transmitting channels, entering into licensing agreements, advertising, or creating or implementing the underlying technology of JadooTV's features, including eMedia and VOD. Sohail Decl. ¶¶9-21. Those duties were delegated to industry experts in Pakistan and the teams they oversaw. Sohail Decl. ¶¶14; 17-21.

As CEO of JadooTV, Mr. Sohail led the company's strategic direction toward growth, revenue, and profitability from California. Sohail Decl. ¶9. Although Mr. Sohail has a degree in electrical engineering, he is not a software engineer for JadooTV. Sohail Decl. ¶15. While DISH has sought to portray JadooTV as a merely an alter ego of Mr. Sohail, this is not the case.

JadooTV had operations in both California and Pakistan. Sohail Decl. ¶11. While the company's sales, marketing, finance, and operations were in California, many of the company's departments were in centralized in Pakistan, such as content, engineering, customer support, and network operations. *Id.* JadooTV also worked with other business entities that contracted with JadooTV, namely, Altair Technologies[10] and IDC Resources. *Id.* The content and network operations teams were later moved from Altair Technologies to IDC Resources in 2014. *Id.*

---

[10] Altair Technologies is a separate entity, but Mr. Sohail does have an ownership interest in it. Sohail Decl. ¶13.

As discussed above, JadooTV's engineering team was run by Faisal Abdullah who worked for Altair Technologies in Pakistan. Sohail Decl. ¶13. Mr. Abdullah was in charge of research and development and oversaw the development of all software, including for the Jadoo4 and Jadoo5 set top boxes and all applications ("apps") with a team of approximately 20 software developers. *Id.* at ¶14. In 2015, JadooTV worked with its contractors to add eMedia to its Jadoo4 and Jadoo5 boxes. *Id.* Implementation of eMedia was completely in the hands of the engineering team in Pakistan. *Id.* They decided to use XML files to add content to JadooTV and also to host it with GitHub. *Id.* at ¶14. Information regarding eMedia, VOD, and LiveTV's features and functions were provided from the engineering team to Mr. Sohail, not the other way around. *Id.* at ¶¶14, 27-28; 30-32.

Mr. Sohail did not (and still does not) have the technical skills to design, change, or engage with the technology behind the applications and programs on JadooTV's set-top-boxes. *Id.* at ¶15. With regard to content and advertising, JadooTV had a contract with a company called IDC Resources, which was run by Faisal Aftab in Pakistan. Sohail Decl. ¶11. Mr. Aftab had deep industry experience as the Executive Director of MTV Networks. Deposition of Faisal Aftab Vol. I ("Aftab Depo. I") at 14:25-19:8.[11] Mr. Aftab and IDC handled the content and advertising for JadooTV since 2012. Sohail Decl. ¶17. Mr. Aftab was also responsible for negotiating and signing licensing agreements and removing content.[12] *Id.*; Aftab Depo. I at 35:18-37:3; 38:14-39:23 (**Ex. 9** to Poppler Decl.). Mr. Aftab's content team were employees of IDC Resources, and they were responsible for video-on-demand (VOD) and live channel monitoring for JadooTV. Sohail Decl. ¶18. More specifically, IDC Resources employed Haseeb Shah to manage network operations of the livestreams worldwide. IDC Resources employed a man named Awais Malik to serve as the VOD manager. Sohail Decl. ¶¶18; 20.

Mr. Sohail was not responsible for instructing IDC Resources or the content team on what specific programs to make available on VOD. Sohail Decl. ¶20; JadooTV 30(b)(6) Deposition of Sajid Sohail ("30(b)(6) Depo.") at 137:5-20 (the content team primarily made decisions about

---

[11] Attached as **Exhibit 9** to the Poppler Decl.
[12] Mr. Sohail was occasionally involved in high-value licensing agreements. Sohail Decl. ¶17

10

which channels to transmit on the JadooTV service as they knew what was "popular" and "available")[13]. DISH acknowledges in its FAC that Mr. Sohail took a hands-off approach to content by referencing an August 2018 email from Mr. Sohail stating he did not need to be copied on content-related emails.  ECF No. 194 at ¶59. Transmission of content, licensing, advertising, and removal of content all fell within Mr. Aftab's purview. In addition, it was Mr. Aftab who directed and authorized the work of the team that Mr. Shah was a part of, not Mr. Sohail. Deposition of Faisal Aftab Vol. II ("Aftab Depo. II") at 233:2-6.[14]  Mr. Sohail communicated with Mr. Malik and Mr. Shah approximately once a week about high-level issues involving VOD and service issues, but they did not directly report to him. Sohail Decl. ¶18; Aftab Depo. II at 236:6-17 (**Ex. 10** to Poppler Decl.).  Since the content team's work had a direct impact on the JadooTV service, they also spoke with the sales and marketing teams about service issues or content availability issues in various parts of the world. Sohail Decl. ¶19.

DISH alleges in ¶37 of its FAC that Mr. Shah accessed JadooTV's PayPal account.  ECF No. 194. It is Mr. Sohail's understanding that Mr. Shah had authority to use JadooTV's PayPal account. Sohail Decl. ¶21. Is it also Mr. Sohail's understanding that Mr. Shah had administrator access to CDN servers hosting or streaming JadooTV's channels, and that he had the ability to upload content to CDN servers along with other members of network operations team. *Id.*

### E.  JadooTV's Last-Ditch Effort to Appease DISH

Although JadooTV believed DISH's complaint to be without merit, JadooTV nevertheless tried again to resolve the matter. After the complaint was filed in November 2018, JadooTV's engineering team revisited the task of trying to design a software patch that would filter out content from eMedia if content names were provided by content owners. Sohail Decl. ¶31. The same problems that were discussed in 2016 related to removing content from eMedia persisted because the content was not within JadooTV's control. As a result, the content could not be removed, the best they could do was try to filter the content. The odds of success were low, and it would be a burdensome and time-consuming task because server-side software had to be written to

---

[13] 30(b)(6) Depo attached as **Exhibit 11** to Poppler Decl.
[14] Attached as **Exhibit 10** to the Poppler Decl.

monitor box traffic and then a filter had to be created which had to tell the client-side boxes and apps to block those channels from loading. *Id.* The design and implementation of the software took at least four months with the whole software team in Pakistan working on it. *Id.* By April 2019 the filter was in place, but it had still had flaws. Sohail Decl. ¶31. Content providers could change the name of the content and the filter would fail. Sohail Decl. ¶31. JadooTV kept DISH apprised of these developments. **Ex. D** to Sohail Decl.

Without a viable filter solution, in August of 2019, JadooTV made the difficult decision to completely remove the eMedia app from its set-top boxes and apps. Sohail Decl. ¶32. This removed the material DISH identified, but it also removed all other content from JadooTV's boxes and applications. *Id.* This was a last resort because eMedia was well-liked and used by customers and content providers for purposes completely unrelated to DISH's content. *Id.* Although the alleged infringement ceased over three years ago, DISH insists on continuing to doggedly pursue JadooTV through this litigation.

### F.  DISH's Conduct Pushes JadooTV into Bankruptcy

Between interfering with JadooTV's licensing contracts, forcing JadooTV's retailers to stop selling to JadooTV, threatening JadooTV's retailers, and the legal fees defending itself against DISH, DISH could no longer pay its vendors and partners. On or about May 31, 2019, JadooTV filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Northern District of California. Sohail Decl. ¶33.

Litigation is a poor substitute for offering appealing products at competitive prices to consumers. Sohail Decl. ¶34. Although DISH has tried to eliminate JadooTV through corporate bullying, espionage and this litigation, even after JadooTV removed its eMedia application in August 2019, DISH has still failed to break into the South Asian programming market as reflected in its dwindling numbers of Arabic, Hindi, Urdu, and Bangla subscribers. *Id,* subscriber lists attached as **Exs. 7 and 8** to the Poppler Decl.

### III.    LEGAL STANDARD

Summary judgment is warranted where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A court

must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A party cannot avoid summary judgment if their "evidence is merely colorable, . . . or is not significantly probative"; "[t]he mere existence of a scintilla of evidence… will be insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). Thus, "a moving party without the ultimate burden of persuasion at trial… may carry its initial burden of production by either producing evidence negating an essential element of the nonmoving party's case, or . . . showing that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. CO. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000).

## IV.    ARGUMENT

### A.  Mr. Sohail Is Entitled to Summary Judgment on Count One For Direct Copyright Infringement Because He Did Not Authorize or Participate in the Infringement.

Mr. Sohail is not personally liable for direct copyright infringement. In order to hold a corporate officer liable for the company's actions, the plaintiff must show that the corporate officer was the "guiding spirit" or "central figure" behind the wrongful conduct. *Davis v. Metro Prods., Inc.*, 885 F.2d 515, 524 (9th Cir. 1989); *see also Carson v. Verismart Software*, 2012 WL 1038662, at \*5 (N.D. Cal. Mar. 27, 2012) (corporate officer not found liable for copyright infringement where plaintiff did not show that corporate officer was an "active conscious force behind the corporation's infringement") (citations omitted).

Here, DISH cannot meet its burden to establish Mr. Sohail's personal liability for direct copyright infringement. Mr. Sohail selected JadooTV's management team with specific expertise and delegated duties to oversee the content and engineering aspects of the business. Sohail Decl. ¶¶14; 17-21. JadooTV contracted with IDC Resources and Altair Technologies to provide workers and services in Pakistan, and Mr. Abdullah and Mr. Aftab oversaw the content and engineering departments. *Id.* These teams were responsible for software, licensing, content transmission and removal, network operations, customer support, and advertising. Sohail Decl. ¶¶11, 13, 27-28, 30-32. Mr. Sohail did not oversee the day-to-day operations of the engineering

13

NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT SAJID SOHAIL'S MOTION FOR SUMMARY JUDGMENT

and content teams, he did not personally select or transmit programming, and he did not have the technical expertise to design or change software. *Id.* at ¶¶15, 17, 18-21.

Similarly, Mr. Aftab, not Mr. Sohail, oversaw licensing. Sohail Decl. ¶11. Mr. Aftab was on the ground in Pakistan with deep industry knowledge as someone who was credited with bringing MTV to South Asia and who understood the importance of delivering culturally relevant content to customers. Aftab Depo. I at 14:25-19:8 (**Ex. 9** to Poppler Decl.). He not only negotiated and signed licensing agreements he also removed content, as needed. Sohail Decl. ¶17; Aftab Depo. I at 35:18-37:3; 38:14-39:23 (**Ex. 9** to Poppler Decl.). Mr. Sohail was not responsible for instructing IDC Resources or the content team on what specific programs to make available on VOD. Sohail Decl. ¶20. As such, Mr. Sohail was not the "guiding spirit" or "central figure" behind any alleged infringement. *Davis*, 885 F.2d 515, 524 (9th Cir. 1989). DISH has also failed to establish that Mr. Sohail was an "active conscious force" behind any alleged infringement. *Carson*, 2012 WL 1038662, at *5. As such, Mr. Sohail is entitled to summary judgment on direct copyright infringement as a matter of law.

**1.  DISH Has Not Shown that Mr. Sohail Acted with Volition and/or That He was the Central Figure In Any Alleged Copyright Infringement**

In a copyright infringement action, the plaintiff must also show that the defendant acted with "volition" such that the individual defendant's conduct is the direct cause of the infringement. *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 731 (9th Cir. 2019). Further, where infringement is based on "automatic" activities then there is no showing of volition for direct infringement. *Id.* at 732. Here, DISH cannot prove that Mr. Sohail acted with volition to commit direct infringement.

**2.  Mr. Sohail Did Not Develop JadooTV to Transmit DISH's Alleged "Protected Channels."**

JadooTV entered the Internet-based streaming market in 2008 to provide an affordable mechanism for South Asian audiences to view entertainment from India, Pakistan, Bangladesh, Afghanistan and the Middle East. Sohail Decl. at ¶7. This was long before DISH launched its

1  online television service SlingTV in 2015. Sohail Decl. at ¶¶7, 8, 22; *see also* ECF No. 194-1

2  (Exhibit 1 to DISH FAC showing copyrighted works were first registered in 2018). As such, Mr.

3  Sohail did not design the JadooTV service to directly stream the alleged Protected Channels

4  through the Jadoo set-top box as DISH alleges. ECF No. 194 at ¶2. Indeed, when Mr. Sohail

5  launched JadooTV, he built business relationships and entered into agreements with channels,

6  including those DISH's alleges as "Protected Channels",  to stream programs though JadooTV's

7  internet-connected box. *Id.* at ¶¶22, 23. DISH interfered with JadooTV's pre-existing agreements

8  with the channels when DISH decided to expand its satellite program offerings to internet-based

9  streaming. *Id.* at ¶23; Salahuddin Depo. at 29:23-31:7 (After JadooTV had an established

10  agreement with HUM, DISH entered into an exclusive agreement with HUM) (**Ex. 1** to Poppler

11  Decl.); Dunya TV Agreement with DISH from July 2012 (Section 5 states that Dunya "will not be

12  available via the Jadoo website or any successor or replacement thereof") (**Ex. 3** to Poppler Decl.).

13  DISH has failed to show that Mr. Sohail acted with volition to directly infringe the Protected

14  Channels as alleged in DISH FAC at ¶¶ 2, 18, 76.

15       Moreover, the mere development of the Jadoo's streaming technology itself, without

16  more, cannot hold Mr. Sohail personally liable for direct infringement. Indeed, bare allegations

17  that a corporate officer engaged in "automatic copying, storage, and transmission of copyrighted

18  materials, when instigated by others" does not impose liability on the corporate officer. *VHT, Inc.*,

19  918 F.3d at 731. DISH's allegations that paint Mr. Sohail as a copyright infringer are false and

20  contradicted by the legitimate purposes behind creating JadooTV in 2008.

21

22  ### 3. Mr. Sohail Did Not Control Content Available Through eMedia and VOD Features of JadooTV's Set Top Boxes

23  DISH cannot prove its allegations that Mr. Sohail directly infringed on DISH's copyrights

24  by way of JadooTV's eMedia app and VOD features because he did not have control over the

25  material. To hold Mr. Sohail liable, DISH must show that Mr. Sohail exercised control by either

26  "selecting material for upload, download transmission or storage" or by "instigating any copying,

27  storage or distribution of. . ." the copyrighted material. *VHT, Inc.,* 918 F.3d at 732.

28

The evidence shows that the eMedia app was intended to be "open" and was entirely user-controlled and all such content on the eMedia app was device-specific. Sohail Decl. ¶¶14, 16, 27. JadooTV had no control over the content customers added to their boxes through eMedia and the company did not track that information. Sohail Decl. ¶¶26, 27. Similarly, the VOD content that DISH complained about was bookmarked content that was hosted by third-parties on the Internet, including from publicly available links from YouTube and Dailymotion. Sohail Decl. ¶¶20, 28. VOD content was neither hosted on JadooTV's servers nor copied to its servers. *Id.*  ¶28. In both circumstances, neither JadooTV nor Mr. Sohail had control over that third-party content. **Exs. A and B** to Sohail Decl.

As discussed in Section IV(A), Mr. Sohail did not control uploading, downloading, transmission, storage, or distribution of content as those responsibilities were overseen by industry experts in Pakistan who controlled the content and engineering aspects of the business. Indeed, Mr. Sohail did not (and still does not) have the technical skills to design, change, or engage with the technology behind the applications and programs on JadooTV's set-top-boxes. Sohail Decl. ¶15. While Mr. Sohail communicated with VOD and network operations/livestreams managers, including Mr. Shah, regarding high-level service and content availability issues, they did not report to Mr. Sohail and he did not oversee their work. Sohail Decl. ¶¶18-19. As such, DISH cannot prove that Mr. Sohail is personally liable for direct copyright infringement on the basis of his control over the allegedly infringing material.

### 4.   Mr. Sohail Took Action to Remove Content that DISH Claimed to Have Exclusive Rights

The evidence shows that when JadooTV was notified by DISH of allegedly infringing content on the set-top boxes, JadooTV took action.  Sohail Decl. ¶¶25-32; **Exs. A, B, C, D** to Sohail Decl. Mr. Sohail contacted and worked with JadooTV's content and engineering teams to determine what content they had control over and if they could address DISH's concerns. *Id.* JadooTV agreed to remove content identified by DISH when JadooTV's content and engineering teams in Pakistan could identify it and determined that they had control over the material. Sohail Decl. ¶30; **Ex. A** to Sohail Decl. As discussed in section IV(B)(2) above, JadooTV explained to

1   DISH that it did not have the ability to remove third-party content available through eMedia and

2   VOD.

3          Between 2016 and 2019, Mr. Sohail went to extraordinary lengths to work with the

4   content and engineering teams in Pakistan to appease DISH. Sohail Decl. ¶¶25-32.  In 2016, Mr.

5   Sohail inquired with JadooTV's engineering team in Pakistan to determine if certain content could

6   be blocked in eMedia. Sohail Decl. ¶¶26, 27. But JadooTV's engineering team informed Mr.

7   Sohail that this would be practically impossible because JadooTV had no control over the content

8   customers added to their boxes and the company did not track that information. *Id.* After the

9   complaint was filed in November 2018, Mr. Sohail again went back to JadooTV's engineering

10  team to revisit the task of trying to block eMedia content in an effort to resolve the matter

11  expeditiously. The same problems that were discussed in 2016 related to removing content from

12  eMedia persisted. The engineering team said they would endeavor to design a software patch that

13  would filter out content from eMedia if specific content names were provided by content owners.

14  Sohail Decl. ¶31. The odds of success were low, and it would be a burdensome and time-

15  consuming task because server-side software had to be written to monitor box traffic and then a

16  filter had to be created which had to tell the client-side boxes and apps to block those channels

17  from loading. *Id.* Just as JadooTV had told DISH in 2016, the content could not be removed, the

18  best they could do was try to filter the content. The design and implementation of the software

19  took at least four months with the whole software team in Pakistan working on it. *Id.* By April

20  2019 the filter was in place, but it had still had flaws. Sohail Decl. ¶31. Content providers could

21  change the name of the content and the filter would fail. Sohail Decl. ¶31. JadooTV kept DISH

22  apprised of these developments. **Ex. D** to Sohail Decl.

23      Once JadooTV concluded that the filtering patch was not viable, JadooTV made the difficult

24  decision to completely remove the eMedia app from its set-top boxes and apps in August 2019.

25  Sohail Decl. ¶32. This was a last-resort because while it removed the material DISH identified, it

26  also removed all other content from JadooTV's boxes and applications. *Id.* Mr. Sohail's good faith

27  efforts to resolve and settle this matter cut against DISH's allegations that Mr. Sohail acted with

28   volition. *See, e.g., Florentine Art Studio, Inc. v. Vedet K. Corp.*, 891 F. Supp. 532, 539 (C.D. Cal.

1995) (defendant's good faith effort to settle an allegation of copyright infringement weighed against a showing of willful copyright infringement).

### 5.  DISH's Thin Allegations Attempting to Impute Liability for Mr. Shah's Conduct to Mr. Sohail Fail

DISH has numerous allegations against an IDC Resources employee, Haseeb Shah, who managed network operations of JadooTV's livestreams worldwide from Pakistan. ECF No. 194 at ¶¶28, 37, 39, 44, 49, 64, 65, 66, 68, 69, 70, 73, 75, 89-90, 110-111; Sohail Decl. ¶18. DISH attempts to hold Mr. Sohail personally liable for the conduct of Mr. Shah by alleging that:

- Mr. Sohail engaged Mr. Shah as his agent to manage JadooTV's servers and live channel streams. ECF No. 194 at ¶59.

- Mr. Sohail directed or authorized or ratified Mr. Shah to transmit copyrighted programs from computer servers controlled by Shah to JadooTV users. *Id.* at ¶89.

- Mr. Sohail had "a close business relationship" with Mr. Shah because there are photos of the two of them on social media at industry conventions.  *Id.* at ¶71.

As stated above in Sections II(D) and IV(A)(3), Mr. Shah was engaged by IDC Resources to manage JadooTV's servers and live channel streams. Sohail Decl. ¶¶17-18. The owner of IDC Resources, Mr. Aftab, directed and authorized Mr. Shah's work, not Mr. Sohail. Deposition of Faisal Aftab Vol. II (Aftab Depo. II) at 233:2-6 (**Ex. 10** to Poppler Decl.). Mr. Sohail communicated with Mr. Shah approximately once a week about high-level issues involving service issues, but Mr. Sohail was not involved in his day-to-day work. Sohail Decl. ¶18; Aftab Depo. II at 236:6-17 (**Ex. 10** to Poppler Decl.). Furthermore, Mr. Shah was a manager of network operations so he may have had access to JadooTV's PayPal account and CDN servers, but Mr. Sohail was not involved in authorizing or overseeing the accounts Mr. Shah accessed during the course of his work.  Sohail Decl. ¶21.

Similarly, as stated above in Section IV(A), Mr. Sohail was not responsible for instructing IDC Resources, the content team, or Mr. Shah on what specific programs to make available. Sohail Decl. ¶20. The content team made decisions about what channels to include because they

knew what was popular and available. 30(b)(6) Depo. at 137:5-20 (**Ex. 11** to Poppler Decl.). DISH acknowledges that Mr. Sohail took a hands-off approach to content by referencing an August 2018 email from Mr. Sohail stating he did not need to be copied on content-related emails.  ECF No. 194 at ¶59. As such, DISH cannot prove that Mr. Sohail is liable for direct infringement on the basis of its allegations against Mr. Shah.

### B.  Summary Judgment Should Be Granted on Count Two For Contributory Copyright Infringement

DISH also fails to establish liability against Mr. Sohail for contributory copyright infringement. DISH must show that Mr. Sohail: (1) had knowledge of another's infringement and (2) either (a) materially contributed to or (b) induced that infringement. *Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 831 (9th Cir. 2019)(citation omitted); see also *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007). While Mr. Sohail disputes the allegations that JadooTV engaged in copyright infringement, the evidence shows that Mr. Sohail did not materially contribute to the alleged infringement and sought to address the alleged infringement when he became aware of it.

In order for DISH to show that Mr. Sohail materially contributed to infringement, it has to establish that Mr. Sohail "substantially assist[ed]" in direct infringement. *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936, 943 (9th Cir. 2011). As described in the sections above, Mr. Sohail did not substantially assist in direct infringement: he selected a management team with specific expertise and delegated duties to oversee the content and engineering aspects of the business. Sohail Decl. ¶¶14; 17-21. JadooTV contracted with IDC Resources and Altair Technologies to provide workers and services in Pakistan, and Mr. Abdullah and Mr. Aftab oversaw the content and engineering departments. *Id.* These teams were responsible for software, licensing, content transmission and removal, network operations, customer support, and advertising. Sohail Decl. ¶¶11, 13, 27-28, 30-32. Mr. Sohail did not oversee the day-to-day operations of the engineering and content teams, he did not personally select or transmit programming, and he did not have the technical expertise to design or change software. *Id.* at ¶¶15, 17, 18-21.

Furthermore, Mr. Sohail did not facilitate access to allegedly infringing content. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1175 (9th Cir. 2007). Indeed, the eMedia and VOD sections of JadooTV were innocuous. *Mon Cheri Bridals, LLC v. Cloudflare, Inc.*, No. 19-CV-01356-VC, 2021 WL 4572015, at *1 (N.D. Cal. Oct. 6, 2021) (innocuous conduct should not be considered material contribution to copyright infringement). JadooTV believed eMedia would be a useful feature to add to Jadoo4 and Jadoo5 boxes because the company received many requests to add content to the platform, but as a small company, there were not enough people to manage all of the requests to add content. Sohail Decl. ¶14. The concept behind eMedia was to allow content owners to create and add content to JadooTV's platform worldwide. *Id.* Providing eMedia made the platform Open.

Similarly, VOD simply provided content to users through bookmarks to content that was hosted by third-parties on the Internet, including from publicly available links from YouTube and Dailymotion. Sohail Decl. ¶¶20, 28. JadooTV had no incentive to encourage consumers to view DISH's content, because JadooTV did not charge users for viewing the third-party content, and JadooTV did not generate any advertising revenue from users viewing the bookmarked VOD content. *Id.* at ¶29. Moreover, any advertisement that was embedded in the bookmarked VOD content was provided by the website hosting the content, not by JadooTV. Sohail Decl. ¶29.

Once DISH notified JadooTV of alleged infringement JadooTV took action to address DISH's concerns.  Between 2016 and 2019, JadooTV engaged in numerous communications with DISH explaining how its set-top boxes operated and how JadooTV was not responsible for the copyright infringement for which DISH was accusing it. Sohail Decl. ¶25. To the extent DISH identified material that JadooTV's content and engineering teams in Pakistan were able to identify and were able to confirm that it was within JadooTV's control, JadooTV removed that content at DISH's request. Sohail Decl. ¶30; **Ex. A** to Sohail Decl. Mr. Sohail inquired with JadooTV's engineering team in 2016 to determine if content from eMedia could be removed. Sohail Decl. ¶¶26, 27. Although it was time-consuming and costly, JadooTV tried to develop a patch to filter out DISH's content from eMedia after this complaint was filed.  *Id.* at ¶31.  Despite JadooTV's best efforts, the patch was flawed and the eMedia app had to be

1    removed altogether in August 2019. *Id.* ¶32.  As such, Mr. Sohail did not magnify or materially

2    contribute to the alleged infringement, he tried to resolve and minimize it.

### C.  Mr. Sohail Is Entitled to Summary Judgment on Count Three For Vicarious Liability

5        DISH fails to establish that Mr. Sohail should be held vicariously liable for any alleged

6    copyright infringement. Copyright law limits the imposition of vicarious liability to

7    circumstances when the defendant "profits directly from the infringement and has a right and

8    ability to supervise the direct infringer."  *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,

9    545 U.S. 913, 930 n.9 (2005); *see also Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir.

10   2004).

### 1.  Mr. Sohail Did Not Profit Directly From any Alleged Infringement

12       "The essential aspect of the 'direct financial benefit' inquiry is whether there is a causal

13   relationship between the infringing activity and any financial benefit a defendant reaps." *Ellison v.*

14   *Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004).  Financial benefit exists where the availability of

15   infringing material acts as a draw for customers. *Id.* at 1078. If the infringing material is "just an

16   added benefit," rather than a draw, it does not confer a direct financial benefit. *Id.* at 1078-79.  A

17   causal relationship exists where revenues flowed directly from customers who purchased

18   copyrighted material to the defendant.  *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263

19   (9th Cir. 2001).

20       Here, JadooTV had no incentive to encourage consumers to view DISH's publicly

21   available VOD content that was provided to JadooTV through bookmarks to links from

22   YouTube and Dailymotion, because JadooTV did not charge users for viewing the third-party

23   content, and JadooTV did not generate any advertising revenue from users viewing the

24   bookmarked VOD content. Sohail Decl. ¶¶20, 28, 29. Moreover, any advertisement that was

25   embedded in the bookmarked VOD content was provided by the website hosting the content, not

26   by JadooTV. Sohail Decl. ¶29.

27       For instance, in *Ellison*, the plaintiff alleged that AOL financially benefited from the

28   availability of his copyrighted short stories that were scanned for viewing on a subscriber news-

21

group network on America Online, Inc. (AOL). 357 F.3d at 1074. However, the Ninth Circuit found there was no causal relationship between the infringing activity and any financial benefit received by the defendant because "there is no evidence that indicates that [the defendant's] customers either subscribed because of the available infringing material or canceled subscriptions because it was no longer available." *Id.* at 1079. The court concluded: "Accordingly, no jury could reasonably conclude that AOL received a direct financial benefit from providing access to the infringing material. Therefore, plaintiff's claim of vicarious copyright infringement fail[s]." *Id.* at 1079- 1080. The same is true here. Mr. Sohail did not receive a direct financial benefit from providing access to third-party content or bookmarked publicly available VOD content.

### 2.   Mr. Sohail Had No Ability to Unilaterally Identify and Remove Infringing Content By Third Parties

Here, it is beyond dispute that Mr. Sohail had no right and ability to supervise the infringers alleged by DISH. A defendant's ability to supervise or control infringing activity is assessed based on the defendant's actual ability at the time of infringement. *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F3d 788, 805 (9th Cir. 2007).  To show an ability to supervise infringing conduct, a plaintiff must show that the defendant had the technical ability to identify and remove the alleged infringements. *VHT, Inc.*, 918 F.3d at 746 (noting defendant's "failure to change its operations to avoid assisting [users] to distribute . . . infringing content . . . is not the same as declining to exercise a right and ability to make [third parties] stop their direct infringement."(citations omitted). The ability to exert an "indirect effect on the infringing activity" is not enough.  *Id.*

Here, it is undisputed that Mr. Sohail did not have control over the users who were adding content to eMedia. Sohail Decl. ¶¶26-27. Similarly, Mr. Sohail did not have control over VOD content provided through third parties as it was neither hosted on JadooTV's servers nor copied to its servers.  *Id.* at ¶28. And although JadooTV worked with the engineering group to develop a patch that would filter material from eMedia, it was not entirely effective and the entire eMedia application was removed in August 2019. *Id.* at ¶32. Mr. Sohail is not a software

engineer and does not have the technical skills to design or engage with the technology behind the applications and programs on JadooTV's set-top-boxes. *Id.* at ¶15.

## V.    CONCLUSION

For the foregoing reasons, Mr. Sohail respectfully requests that this Court grant his motion for summary judgment on all causes of action.

Dated:  March 13, 2023                           Respectfully submitted,

                                                 CHAN PUNZALAN LLP
                                                 */s/ Chowning Poppler*
                                                 Chowning Poppler
                                                 Mark Punzalan
                                                 Jin Im-Saeteurn
                                                 Lawrence Ng

                                                 *Counsel for Defendants*
                                                 *JadooTV, Inc. and Sajid Sohail*

NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT SAJID SOHAIL'S MOTION FOR SUMMARY JUDGMENT