1

2

3

4

5          IN THE UNITED STATES DISTRICT COURT

6          FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8    DISH NETWORK L.L.C.,                     Case No.  20-cv-01891-CRB

9                    Plaintiff,
                                              **ORDER GRANTING DISH MOTION**
10           v.                               **FOR SUMMARY JUDGMENT,**
                                              **DENYING SOHAIL MOTION FOR**
11   JADOO TV, INC., et al.,                  **SUMMARY JUDGMENT**

12                    Defendants.

13          In this copyright infringement case, Plaintiff DISH Network L.L.C. ("DISH") sued

14   Defendants Sajid Sohail and Jadoo TV, Inc. ("Jadoo"), a company that sells set-top boxes and

15   mobile applications that consumers use to receive television channels.  DISH alleges that

16   Defendants violated 17 U.S.C. Section 501 by illegally transmitting television channels and

17   content exclusively licensed by DISH.  DISH brings claims for direct, contributory, and vicarious

18   infringement.  Because Sohail is the founder, CEO, and majority shareholder of Jadoo, DISH

19   alleges that Sohail is personally liable for the alleged infringement.

20          DISH and Sohail bring cross-motions for summary judgment or, in the alternative,

21   summary adjudication.[1]  DISH Mot. (dkt. 242); Sohail Mot. (dkt 243).  Because there are no

22   genuine disputes of material fact as to Jadoo's and Sohail's liability for direct, contributory, and

23   vicarious infringement, the Court GRANTS DISH's motion as to all claims, and DENIES Sohail's

24   motion as to all claims.

25

26

27

28   _____
     [1]  DISH moves for summary judgment against Jadoo and Sohail.  Jadoo does not join Sohail in
     moving for summary judgment, but Defendants do file a joint opposition brief to DISH's motion.

United States District Court
Northern District of California

I.      **BACKGROUND**[2]

A.      **Jadoo's Service**

In 2008, Sohail founded Jadoo "to bring internet-based South Asian and multicultural television, movies, and music to audiences from India, Pakistan, Bangladesh, Afghanistan and the Middle East at an affordable price."  Sohail Mot. Ex. 14[3] (dkt. 243-14) ¶ 7.

When launching Jadoo, Sohail entered into agreements with channels to stream their programs through its service.  Id. ¶ 22.  Jadoo sold set-top-boxes ("STBs"), which are computing devices able to receive video signals and translate them for viewing on a television screen. Defendants Opp'n Ex. 20 (dkt. 257-20) ¶ 18.  Jadoo's STBs run on an Android operating system. Id.  Jadoo contracted with a third party, Altair Technologies, to develop software for its three features: eMedia, Video on Demand, and LiveTV (collectively, "the Service").  DISH Mot. Ex. 2 (dkt. 242-2) Apx.[4] at 201:9–22; 204:22–205:2.

The content on Jadoo's Video on Demand ("VOD") largely came from publicly available links, such as those on YouTube and Dailymotion.  Defendants Opp'n Ex. 1 (dkt. 257-1) ¶ 25. Jadoo released eMedia in 2015 to allow users to add content to their STBs from the internet or external media devices.  Id. ¶ 27.  Faisal Abdullah, head of engineering for Jadoo and employee of Altair Technologies, oversaw a team of approximately 20 software developers in designing and implementing all software applications for the company, including eMedia.  Id. ¶ 28.  The engineering team decided to use XML files[5] to add content to Jadoo and to host it with Github.[6] Id.  Jadoo advertised eMedia as a tool for users to upload and watch content that was not licensed by Jadoo.  DISH Mot. Ex. 2 at 357 ("Calling Content Providers & Developers to Add Content to the Jadoo4 Box.  Calling Users to Aggregate Content in One Easy Place.").  Finally, eMedia integrated user-uploaded content into the LiveTV and VOD sections of Jadoo.  Id. at 240:11–

---

[2]  The facts in this section are not in genuine dispute.

[3]  Citations to exhibit numbers are to the ECF attachment/ docket number, not the exhibit number used by the parties.

[4]  Citations are to the Appendix page numbers used by DISH in the attachments to its motion.

[5]  XML stands for "eXtensible Markup language," which is a "human and machine readable" language, and "a standard way of exchanging information."  DISH Mot. Ex. 7 (dkt. 242-7) at 1298 n.23.

[6]  Github "is a third-party website used by software developers to host software projects."  DISH Mot. Ex. 7 at 1301.

241:9.

### B.     Alleged Infringement

Since September 2016, DISH has sent Jadoo notices of infringement that identified the locations in the LiveTV, eMedia, and VOD sections of the Service that contained channels that DISH had the exclusive right to perform ("Protected Channels").  DISH Mot. Ex. 2 11 ¶ 15. Sohail confirms that he knew in 2016 that users were sharing the Protected Channels through eMedia.  Id. Ex. 2 at 263:16–264:6.

DISH owns 97 works registered with the U.S. Copyright Office ("Registered Works").  Id. Ex. 15 (dkt. 242-15) at 2881–82 ¶ 8 (12 Works);  Id. Ex. 16 (dkt. 242-16) at 3059 ¶ 9 (3 Works); Id. Ex. 17 (dkt. 242-17) at 3202 ¶ 8 (14 Works); Id. Ex. 22 (dkt. 242-22) at 3641–45 ¶ 6 (55 Works); Id. Ex. 2 at 10–11 ¶ 14 (13 Works).  DISH also owns 159 works not registered but otherwise protected ("Unregistered Works").  Id. Ex. 15 at R2880 ¶ 6 (13 Works); Id. Ex. 16 at 3056–59 ¶¶ 7–8 (38 Works);  Id. Ex. 17 at 3197–3202 ¶¶ 6–7 (52 Works); Id. Ex. 22 at 3645–46 ¶ 7 (17 Works); Id. Ex. 30 (dkt. 242-30) at 5086 ¶ 9 (16 Works); Id. Ex. 31 (dkt. 242-31) at 5225–27 ¶¶ 6–7 (23 Works).  Jadoo's users uploaded all of the Registered Works and Unregistered Works (collectively, "the Works") to the Service, including in the South Asian Super Pack ("SASP").[7] Jadoo's users performed the Works in the SASP ("SASP Works") in the US over the internet on the Service more than 2,616 times between February 22, 2016 and August 6, 2019.  DISH Mot. Ex. 8 (dkt. 242-8) at 1459 ¶ 16.  The SASP Works include 93 Registered Works and 154 Unregistered Works.  Id. at 1457–58 ¶ 12; 1786–1806 (Registered Works at rows 1–93, Unregistered Works at rows 94–247).  Jadoo's users also performed VOD Works, again without DISH's permission, including 18 Registered Works and 5 Unregistered Works.  Id. at 1458–59 ¶¶ 13–14, 17; 1791–1806 (Registered works at rows 248–72, Unregistered Works at rows 273–77).

Jadoo sold its model Jadoo5s STBs preconfigured to automatically locate and install SASP, including the Works, to the eMedia and LiveTV sections of the Service.  Id. at 1467–68. Users could add SASP to Jadoo4 and Jadoo5 STBs by using the eMedia search feature or typing a

---

[7]  The SASP was a collection of channels that users downloaded through eMedia, and it included the Protected Channels that transmitted the Works.

URL.  Id. at 1468–70.  Users watched the Protected Channels on the Service in the LiveTV, eMedia, and VOD features.  Id. at 1456–57 ¶ 8.

After DISH filed the present action in November 2018, Jadoo blocked or removed access to the Protected Channels on or about April 12, 2019.  Id. at 1457 ¶ 9; Sohail Mot. Ex. 14 (dkt. 243-14) ¶ 31.  But users were able to add the Protected Channels back by following instructions on a YouTube video.[8]  DISH Mot. Ex. 8 at 1457 ¶ 10.  Jadoo ultimately removed the eMedia section in August 2019, which stopped the infringement of the Protected Channels (and thereby the Works).  Id. 1457 ¶ 11; Sohail Mot. Ex. 14 ¶ 32.

### C.    Procedural History

DISH filed an amended complaint on July 16, 2020, bringing claims for direct, contributory, and vicarious infringement.  First Amended Complaint ("FAC") (dkt. 194).  On August 7, 2020, Sohail filed both an answer to the FAC and a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Answer (dkt. 203); Mot. (dkt. 201).  The Court denied Sohail's motion to dismiss, holding that DISH plausibly stated claims of direct, contributory, and vicarious infringement as to Sohail.  See Order (dkt. 207); DISH Network L.L.C. v. Jadoo TV, Inc., No. 20-CV-01891-CRB, 2020 WL 5816579 (N.D. Cal. Sept. 30, 2020) ("DISH").

DISH and Sohail now bring cross-motions for summary judgment or, in the alternative, summary adjudication.  DISH Mot.; Sohail Mot.  Those motions are fully briefed.  See DISH Opp'n (dkt. 254); Defendants Opp'n (dkt. 257); Sohail Reply (dkt. 260); DISH Reply (dkt. 261).

In addition, DISH moves to exclude the rebuttal testimony of Defendants' experts, Elizabeth Groves and Petra Loer.  Mot. to Exclude Groves (dkt. 247); Mot. to Exclude Loer (dkt. 248); see also Defendants Opp'n to Exclude Groves (dkt. 255); Defendants Opp'n to Exclude Loer (dkt. 256); DISH Reply to Exclude Groves (dkt. 258); DISH Reply to Exclude Loer (dkt. 259).

## II.    LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits show that

---

[8]  There is no evidence indicating that Defendants created this YouTube video.

there is "no genuine dispute as to any material fact and the [moving] party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.

The moving party for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  Id.  But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case."  Id.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings to demonstrate the existence of a genuine dispute of material fact by "citing to specific parts of material in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute."  Fed. R. Civ. P. 56(c).  A triable dispute of fact exists only if there is sufficient evidence favoring the nonmoving party to allow a jury to return a verdict for that party.  Anderson, 477 U.S. at 249.  If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law."  Celotex, 477 U.S. at 323.

It is not a court's task "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir.1996) (internal citation omitted).  Rather, a court is entitled to rely on the nonmoving party to "identify with reasonable particularity the evidence that precludes summary judgment."  See id.  When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor.  Anderson, 477 U.S. at 255; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Finally, when parties file cross-motions for summary judgment, the court must consider all the evidence submitted in support of the motions to evaluate whether a genuine dispute of material

fact exists precluding summary judgment for either party.  The Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two, 249 F.3d 1132, 1135 (9th Cir. 2001).

## III.   DISCUSSION

DISH and Sohail move for summary judgment as to all claims.  DISH Mot. at iii; Sohail Mot. at i.  This order discusses the claims in the following order: (A) direct infringement, (B) contributory infringement, and (C) vicarious infringement.[9]  Because the Court concludes that Jadoo and Sohail are liable as to all claims, the Court GRANTS DISH's motion and DENIES Sohail's motion.

### A.   Direct Copyright Infringement Under 17 U.S.C. Section 501

DISH's first claim against Defendants is for direct copyright infringement.  To establish a prima facie case of direct copyright infringement, plaintiffs must show: (1) ownership of the allegedly infringed material and (2) that the alleged infringers violated at least one exclusive right granted to copyright holders.  A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1013 (9th Cir. 2001).  In the Ninth Circuit, the plaintiff must also show that the defendant acted with "volition" such that the defendant's conduct is the direct cause of the infringement.  VHT, Inc. v. Zillow Grp., Inc., 918 F.3d 723, 731 (9th Cir. 2019).

#### 1.   Ownership

It is undisputed that DISH owns the allegedly infringed material.  DISH owns 97 Registered Works and 159 Unregistered Works.  See supra Section I.B.  Defendants do not contest that DISH owns these Works, or that the works are protected by U.S. law.  See generally

---

[9]  In response to DISH's motion, Defendants argue that they are entitled to safe harbor from DISH's claims under the Digital Millennium Copyright Act ("DMCA").  Defendants Opp'n at 9–11.  But, as DISH points out, the Ninth Circuit held that "the DMCA safe harbors are affirmative defenses."  Columbia Pictures Indus., Inc. v. Fung, 710 F.3d 1020, 1039 (9th Cir. 2013); see DISH Reply at 1.  Defendants did not raise a DMCA safe harbor affirmative defense in answering the original or amended complaint.  See Defendants' Answer to Complaint (dkt. 28); Jadoo's Answer to Amended Complaint (dkt. 203); Sohail's Answer to Amended Complaint (dkt. 210).  Accordingly, Defendants waived the DMCA safe harbor defense by failing to plead it when answering the complaint.  See Mavrix Photographs LLC v. Sandra Rose LLC, No. 15-cv-596-CBM-AGRx, 2016 WL 6246408, at *2 (C.D. Cal. Apr. 6, 2016) (citing In re Adbox, Inc., 488 F.3d 836, 841 (9th Cir. 2007)).

1   Defendants Opp'n.

2      Instead, Defendants advance three arguments, none of which create a genuine dispute of

3   material fact.

4      First, Defendants argue that they were only given notice in the FAC of 91 (out of 97)

5   Registered Works.  Defendants Opp'n at 14.  But the FAC clearly states that "Registrations have

6   been issued by the United States Copyright Office for <u>at least 91</u> copyrighted works that aired on

7   the Protected Channels" and that "[a] vast number of additional, unregistered copyrighted works in

8   which DISH holds exclusive distribution and public performance rights also aired on the Protected

9   Channels."  FAC ¶ 16 (emphasis added).  DISH demonstrates that it owns 97 Registered Works,

10  and Defendants do not provide any conflicting evidence, nor explain why DISH is not entitled to

11  update the number of Registered Works from the FAC.  <u>See</u> <u>id.</u>; <u>supra</u> Section I.B.

12     Next, Defendants contend that DISH's expert stopped monitoring Jadoo's service on

13  October 8, 2018, but that DISH claimed that infringing content was available on the service

14  through April 1, 2019.  Defendants Opp'n at 14.  This assertion only relates to the time of

15  infringement, and is therefore immaterial as to ownership.  In any event, Jadoo conceded in an

16  April 15, 2019 letter to DISH that it did not remove the infringing channels until after DISH sent

17  its letter on April 1, 2019.  Defendants Opp'n Ex. 9 at 2.

18     Finally, Defendants argue that "certain evidence of protected content being transmitted

19  appears unreliable," and they point to a single example where a screenshot of a Protected Channel

20  appears to be a Colgate commercial.  Defendants Opp'n at 14.  But the screenshot lists the name of

21  the Protected Channel (B4U Music), showing that it was available on Jadoo's service.  DISH Mot.

22  Ex. 8 at 1481.  Moreover, other screenshots show the transmission of the Protected Channel in

23  question.[10]  <u>See</u> DISH Mot. Ex. 30 at 5219–22.

---

[10]  DISH also argues that this dispute is immaterial because it "does not seek damages or profits for this Work in the Motion," citing to its Motion for a listing of the Works at the foundation of its suit.  DISH Reply at 3.  But DISH's citation shows that DISH <u>is</u> seeking damages for the Protected Channel.  <u>See</u> DISH Mot. at 4 n.5 (citing DISH Mot. Ex. 30 at 5086 ¶ 9, 5219–22 (showing 16 Unregistered Works transmitted on B4U Music)).  Nonetheless, the only evidence provided demonstrates that B4U Music was available on the Service, and thus there is no genuine dispute as to this fact.

United States District Court
Northern District of California

1    Accordingly, there is no genuine dispute that DISH owned the alleged infringed material.

2    **2.    Violation of Exclusive Right: Right of Performance**

3    Jadoo violated DISH's exclusive right to perform the Works in two independent ways: (a)

4    by enhancing users' access to the infringing content; and (b) by uploading and instigating

5    distribution of the content.

6    **a.    Enhancing Users' Access**

7    DISH argues that Jadoo violated its exclusive right of performance under 17 U.S.C.

8    Section 106(4).  DISH Mot. at 6.  When interpreting this section, the Supreme Court analyzed the

9    legislative history and statutory intent behind the exclusive right to perform a copyrighted work.

10   See Am. Broad. Cos., Inc. v. Aereo, Inc., 573 U.S. 431 (2014).  The Court held that "Congress

11   amended the Copyright Act in large part to reject the Court's [prior] holdings," which held that the

12   activities of community antenna television ("CATV") systems "fell outside the Act's scope."[11] Id.

13   at 439, 441.  The 1976 amendment "clarifies that to 'perform' an audiovisual work means 'to

14   show its images in any sequence or to make the sounds accompanying it audible.'"  Id. at 441

15   (quoting 17 U.S.C. § 101).  Congress also enacted the Transmit Clause, "which specifies that an

16   entity performs publicly when it 'transmit[s] . . . a performance . . . to the public" and defines

17   "'[t]o 'transmit' a performance' as 'to communicate it by any device or process whereby images

18   or sounds are received beyond the place from which they are sent.'"  Id. at 441 (quoting 17 U.S.C.

19   § 101).  The Court held that the Transmit Clause "makes clear that an entity that acts like a CATV

20   system itself performs, even if when doing so, it simply enhances viewers' ability to receive

21   broadcast television signals."  Id. at 442.

22   Applying this history, the Court held that the defendant, Aereo, performs copyrighted

23   works because it "sells a service that allows subscribers to watch television programs, many of

---

[11]  The Court explained that in Fortnightly Corp. v. United Artists Television, Inc., 392 U.S. 390 (1968), it "considered a CATV system that carried local television broadcasting, much of which was copyrighted, to its subscribers in two cities.  The CATV provider placed antennas on hills above the cities and used coaxial cables to carry the signals received by the antennas to the home television sets of its subscribers."  Aereo, 573 U.S. at 439 (quoting Fortnightly, 392 U.S. at 399). Because "the CATV provider 'neither edited the programs received nor originated any programs of its own,'" the Fortnightly Court held that "CATV providers were more like viewers" than broadcasters.  Id. at 439–40 (quoting Fortnightly, 392 U.S. at 392, 399).

which are copyrighted, almost as they are being broadcast." Id. at 442.  Moreover, the Court held

that it was not significant that Aereo's subscribers selected the copyrighted content to watch.  Id.

at 443.  It reasoned that "in Fortnightly, the television signals, in a sense, lurked behind the screen,

ready to emerge when the subscriber turned the knob.  Here the signals pursue their ordinary

course of travel through the universe until today's 'turn of the knob'—a click on a website—

activates machinery that intercepts and reroutes them to Aereo's subscribers over the Internet."  Id.

at 444.

Here, Jadoo acts much like Aereo.  It performed the Works because it is "an entity that acts

like a CATV system" by "enhance[ing] viewers' ability to receive" programming.  See id. at 442.

Defendants argue, without offering a pincite, that Aereo is inapposite because it relied on content

being stored on the company's hard drive.  Defendants Opp'n at 16.  While the Court

acknowledged that "a server save[d] the data in a subscriber-specific folder on Aereo's hard

drive," it did not expand on this detail, or otherwise imply that it was necessary for the Court's

holding.  See Aereo, 573 U.S. at 436.  Instead, the Court relied on Aereo's "overwhelming

likeness" to cable companies.  Id. at 444.  Aereo is apposite because Jadoo also has

"overwhelming likeness" to cable companies in that it sells STBs for consumers to watch

programming, has rights to distribute some content, and advertises itself as a streaming service.

See id.; Sohail Mot. Ex. 14 ¶¶ 8, 22.  Jadoo "is not simply an equipment provider."  See Aereo,

573 U.S. at 442.  On the contrary, it "sells a service that allows subscribers to watch television

programs," and "uses its own equipment" (its STBs) to control and facilitate the Service.  See

Aereo, 573 U.S. at 442; Defendants Opp'n Ex. 1 ¶ 63 ("[S]erver-side software . . . [was] written to

monitor box traffic and create a filter which then had to tell the client-side boxes and apps to block

those channels from loading.").

Jadoo enhanced users' access to the Works in three ways: (i) Jadoo preloaded its STBs

with content; (ii) Jadoo preconfigured its STBs to install the SASP Works; and (iii) after Jadoo

was put on notice of the infringement on eMedia, it did nothing to limit it.

### i.      Jadoo Preloaded its STBs with Content

Jadoo enhanced users' access to the Works by preloading its STBs.  Jadoo's employee,

United States District Court

Northern District of California

Anwar Farooqi, stated that he preloaded eMedia channels on STBs.  DISH Mot. Ex. 4 (dkt. 242-4) at 493:18–494:22.  Defendants counter that Sohail's declaration creates a genuine dispute because he states that "[i]t is my understanding that JadooTV's STB, including models 4, 5, and 5s, are manufactured and distributed without content in the eMedia application."  Sohail Mot. Ex. 14 ¶ 16.  But, as DISH points out, this declaration does not satisfy the requirements of Rule 56(e) of the Federal Rules of Civil Procedure.  See DISH Opp'n at 12–13.  Rule 56(e) states that a declaration "must be made on personal knowledge."  Fed. R. Civ. P. 56.  The Ninth Circuit has held that a defendant's declaration did not satisfy the requirements of Rule 56(e) where the defendant provided statements beginning with "I believe" yet lacked personal knowledge of the statements' details.  Columbia Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc., 944 F.2d 1525, 1529 (9th Cir. 1991).

Here, Sohail lacks personal knowledge of whether Jadoo distributed its STBs preloaded with content.  Indeed, he provides in a separate declaration—immediately before repeating his understanding that Jadoo did not distribute STBs with content—that "JadooTV did not design its own boxes; the manufacturer customized the look and feel for JadooTV.  In other words, the manufacturer determined the features of the hardware and Android OS.  The software application on top was determined by JadooTV's executive team, which included me as well as members of the marketing, engineering, and sales teams."  Defendants Opp'n Ex. 1 ¶ 23.  While Sohail states that he was part of the executive team that determined the software application, he does not explain whether that team ever discussed or determined if Jadoo's STBs were preloaded with content.  In his reply, Sohail objects generally to DISH's argument that he lacks personal knowledge as to this statement and others, but he does not explain the statement at issue, nor does he say how he personally knew whether Jadoo distributed its STBs preloaded with content.  See Sohail Reply at 8.  Thus, "because [Sohail's] declaration is not based on personal knowledge, but on information and belief, his statement does not raise a triable issue of fact."  See Prof'l Real Estate Investors, Inc., 944 F.2d at 1529.[12]

---

[12]  Even if Sohail's statement created a genuine dispute, Jadoo nonetheless enhanced users' access to the Works for the two reasons discussed next.

### ii.    Jadoo Preconfigured its STBs to Install SASP

Jadoo also enhanced viewers' access to the Works by preconfiguring its STBs to install the SASP Works.  It sold Jadoo5s STBs preconfigured to automatically locate and install the infringing content to the eMedia and LiveTV sections of the Service.  DISH Mot. Ex. 8 at 1467–68.  NagraStar—hired by DISH to investigate the infringement—bought Jadoo5s STBs from Jadoo directly, and when powered on, the STBs "automatically located and installed SASP to the eMedia and LiveTV section of the Jadoo TV service."  DISH Mot. Ex. 8 at 1470.  NagraStar observed that "[e]ach of these Jadoo5s provided access to the Protected Channels in both the eMedia and LiveTV sections of the Jadoo TV service."  Id. at 1471.

Defendants argue that this fact is in genuine dispute because of Sohail's statement discussed above.  Sohail Mot. Ex. 14 ¶ 16 ("It is my understanding that JadooTV's boxes are manufactured and distributed without content in the eMedia application. . .").  As noted, this statement lacks personal knowledge and so the Court will not consider it.  See supra Section III.A.2.a.i.  But this statement also does not contest that Jadoo's STBs were preconfigured to install the SASP Works; it just states that the STBs did not have content on them at the time of distribution.  This statement therefore does not undermine NagraStar's finding that once powered on by a user, the Jadoo5s STBs automatically located and installed the SASP Works.

Defendants further argue that because the customer log shows Jadoo5s users contacted Jadoo about adding channels, the models were not preconfigured to install the SASP Works. Defendants Opp'n at 15 (citing DISH Mot. Ex. 6 (dkt. 242-6) at 1035).  But the customer log just shows that users inquired about "How to Find EM URL," which Defendants characterize as customers wanting to add channels to their eMedia.  See id.; DISH Mot. Ex. 6 at 1035.  That customers contacted Jadoo to add unspecified channels does not create a genuine dispute that Jadoo5s STBs were preconfigured to locate and install the SASP Works.

### iii.    Jadoo Did Not Limit the Infringement

Finally, Defendants enhanced users' access to the Works by failing to limit performance of the Works after DISH sent notices of infringement.  Sohail knew about the infringement because he approved Jadoo's responses to DISH's notices.  DISH Mot. Ex. 1 (dkt. 242-1) at 166:7–9.

11

1  Sohail had the ability to remove infringing channels, as he states that he previously removed
2  unspecified channels from the Service.  DISH Opp'n Ex. 1 (dkt. 254-1) at 8:23–25.[13]  Yet Sohail
3  took no actions to remove the infringing content on eMedia after he received DISH's notices.  Id.
4  at 11:10–23.  Indeed, Sohail admits that Jadoo could have taken the action it took in August
5  2019—removing eMedia—after receiving DISH's first notice in 2016.  DISH Mot. Ex. 2 at
6  231:11–232:10.

7        Defendants argue that they could not limit the infringement because they did not have
8  control over the content, as was required in a Ninth Circuit case.  Defendants Opp'n at 15 (citing
9  Perfect 10 Inc. v. Amazon.com, Inc., 508 F.3d 1146 (9th Cir. 2007).  That case addressed Section
10  106(5), which concerns displaying copyrighted work.  Perfect 10, 508 F.3d at 1159.  Section
11  106(5) does have a "server test," which means that the website publisher must "store"
12  photographic images to violate the copyright owner's exclusive right to display the work.  Perfect
13  10, 508 F.3d at 1160.  But here, DISH maintains that Jadoo violated its exclusive right under
14  Section 106(4) because Jadoo performed the Works.  FAC ¶ 87.  Defendants provides no authority
15  stating that there is a "server test" for performance under Section 106(4).  On the contrary, the
16  CATVs targeted by the amended Copyright Act did not "store" data at all; they merely "carr[ied]
17  the signals."  See Aereo, 573 U.S. at 439 (quoting Fortnightly, 392 U.S. at 399).  Aereo therefore
18  suggests that there is no "server test" for performance.

19        Accordingly, Jadoo "enhance[d] viewers' ability to receive" the infringing content.  See
20  Aereo, 572 U.S. at 442.

21                    **b.      Uploading and Instigating Distribution**

22        Jadoo separately violated DISH's exclusive right to perform the Works because there is no
23  genuine dispute that its employee, Haseeb Shah, uploaded and streamed the infringing content,
24  and that Shah was Defendants' agent.

25                            **i.      Shah's Actions**

26  Shah worked for Jadoo before he and his team were transferred to IDC Resources in

27  ────────────────

28  [13]  Citations are to the Supplemental Appendix (Apx.) page numbers attached to DISH's
     opposition.

United States District Court
Northern District of California

Pakistan.  DISH Opp'n Ex. 1 at 57:14–59:20; Sohail Mot. Ex. 14 ¶ 11.  After DISH filed the present motion, Shah left IDC Resources.  DISH Mot. Ex. 3 (dkt. 242-3) at 387:2–8.

DISH expert witness Nigel Jones explains that Shah performed the SASP Works on eMedia via an encrypted Content XML File and the Protected Channels being streamed from EdgeCast/Verizon CDN[14] severs "using token protection, meaning the individual running those accounts had intimate knowledge of JadooTV's accounts and STB, including the eMedia source code."  DISH Mot. Ex. 7 1272 ¶ 8.  These CDNs were managed by different usernames—Ali85one, Peter May, and Rayred—but all belonged to the same individual.  Id. ¶ 9  Because Jadoo did not provide technical support to users to create eMedia files, Jones concluded that the process of uploading the SASP Works was so sophisticated that it required intimate knowledge only available to Jadoo employees.[15]  Id. ¶¶ 4–8.  In fact, Jones could only determine the process of uploading an eMedia file by reviewing Jadoo's source code provided in discovery, and there is no evidence that the source code was publicly available to users.  Id. ¶ 7.  Jones concluded that "Haseeb Shah, under the guise of his alter egos[,] had control of the origin servers (encoders) used to supply SASP content to the CDNs and as such was responsible for the transmission of the copyrighted content."[16]  Id. ¶ 10.

Other evidence corroborates Jones's finding that Shah managed the CDN accounts that streamed the SASP Works.  A few weeks after discussing a Verizon CDN account with Shah, a CDN reseller received a WhatsApp message from a Pakistani phone number inquiring about CDN services.  DISH Mot. Ex. 32 (dkt. 242-32) at 5287–88 ¶¶ 12–13.  The individual insisted on

---

[14] A CDN (Content Delivery Network) is "an IT company that will take the content from the origin server" and "then distribute the feed to local access points on its network."  DISH Mot. Ex. 7 at 1283–84.

[15] Defendants' expert witness, Elizabeth Groves, states that "there is insufficient evidentiary basis to conclusively draw this assertion. While it may be true that the process of creating such an XML file may be difficult, this does not demonstrate that no user would be capable of creating a file."  Defendants Opp'n Ex. 20 ¶ 29.  However, Defendants do not provide any evidence suggesting that a user created the XML file in question.

[16] Defendants' expert, Groves, states that "it cannot be reasonably concluded that" a different username (albertjohn6012) "must be owned by a representative of Jadoo," and that DISH's witness's report did not "establish[] the relevance of the username" as it pertains to Jadoo.  Defendants Opp'n Ex. 20 ¶ 30.  But Groves does not contest the relevance of, nor provide evidence pertaining to, the other usernames analyzed by Jones.

United States District Court
Northern District of California

paying with cash, used the name "Peter May," and registered with the email address pmay360@gmail.com. Id. ¶ 13. In one message to EdgeCast/Verizon technical support, Peter May stated that the "same content is working fine from our other edgecast account" and provided a separate URL, which EdgeCast/Verizon later confirmed led to Jadoo's account. Id. at 5289 ¶¶ 15, 20. Peter May also asked for EdgeCast/Verizon to replicate customized changes from Jadoo's account to May's account. Id. at 5319. Peter May sent a separate email identifying his IP address as the same as Jadoo's IP address, and referring to it as "our IP address." Id. Ex. 2 at 18 ¶ 30(b)–(c). The same occurred for the email address Ali85one@gmail.com Id. ¶ 30(d)–(e). Invoices for a separate CDN account, managed by haseeb110@gmail.com, show that services were paid for using Shah's credit card, house address, and phone number. Id. Ex. 7 at 1312–13 ¶ 20(b). The rayred281@gmail.com address listed ali85one@gmail.com as its back-up. Id. at 1407. The IP addresses used by the alias emails were also used for Shah's personal Facebook, Google, PayPal, Twitter, Flickr, and DynDNS accounts, and Jadoo's PayPal account. Id. at 1409–10. DISH expert witness Gregory Duval researched Peter May's name and email address, and concluded that he is a fictitious person, and that Shah was the one controlling the accounts and performing the SASP Works. Id. Ex. 8 at 1458–59 ¶ 15.

Moreover, Jones determined that the operator of these CDN accounts spent $631,086.67 to stream the content between May 2016 and April 2019; he concludes that only a Jadoo employee would have the financial incentive to expend the funds required to perform the SASP Works. Id. Ex. 7 at 1329. During this period, Defendants transferred $2.7 million to Altair Technologies. DISH Reply Ex. 1 (261-1) at 26:7–35:2. And as noted, the manager of the CDN accounts insisted on paying for the CDNs with cash, suggesting that the money Defendants sent to Altair Technologies could have been used to pay for the CDNs. DISH Mot. Ex. 32 at 5287–88 ¶ 13.

While Defendants' expert Groves does not dispute that a single individual controlled these aliases, she does dispute that that individual was Shah, saying "since a single IP address can represent multiple devices or users, Mr. Jones's IP address analysis is not sufficient to indicate aliases, representation, authorization, or that certain individuals are representative of Jadoo." Id. Ex. 3 at 417:9–423:3; Defendants Opp'n Ex. 20 ¶ 28. But the IP address analysis is not the only

United States District Court
Northern District of California

evidence provided above, and Groves does not dispute the accuracy of the IP analysis in showing that the manager of the CDN accounts used the same IP addresses as Shah.  Finally, Defendants point to PayPal records showing that Peter May's account has a social security number and addresses in New York and Hong Kong.  DISH Mot. Ex. 6 at 1002.  But they do not provide any evidence expanding upon this screenshot, or otherwise showing that Peter May is a real person and not Shah's alias.

Even if there is a genuine dispute as to the IP address analysis, there is no genuine dispute regarding the other evidence indicating that Shah managed the CDN accounts transmitting the infringing content: a Jadoo employee created the XML File, Peter May contacted the CDN reseller from a Pakistani phone number, the aliases managing the CDNs were all one person, the alias emails were used as back-ups for one another, May referred to Jadoo's CDN account as his, May asked for changes to be replicated from Jadoo's account to his, May referred to Jadoo's IP address as his, Shah paid for a CDN account using his credit card and personal information, May paid $631,086.67 in cash for the CDNs, and Jadoo transferred $2.7 million to Altair Technologies. This evidence demonstrates that Peter May is a fictious person, and that Shah performed the SASP Works.

### ii.      Shah was Defendants' Agent

In California, "'[a] principal who personally engages in no misconduct may be vicariously liable for the tortious act committed by an agent within the course and scope of the agency,'" an agency relationship is the "manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act,'" and "when ' 'the evidence is susceptible of but a single inference,' ' summary judgment may be appropriate." Barenborg v. Sigma Alpha Epsilon Fraternity, 33 Cal. App. 5th 70, 85 (2019) (internal citations omitted).

Here, Jadoo consented to having Shah "act on [its] behalf and subject to [its] control." See id. Jadoo hired him to manage the network operations group that monitored the live streams worldwide that were on Jadoo's service.  DISH Mot. Ex. 2 at 210:9–12.  Shah had administrative access to Jadoo's CDN servers hosting or streaming Jadoo channels, and authority to use Jadoo's

PayPal account.  Id. at 211:4–17; 212:7–10.  Jadoo instructed employees to contact Shah directly regarding content.  Id. at 215:23–217:14; 218:17–220:7.  Shah oversaw content for Jadoo, and he reported to Sohail, communicating at least weekly.  Id. at 154:11–19; 208:1–23.  Jadoo also controlled Shah's salary.  Id. at 214:8–19.

Defendants argue that they did not direct or authorize Shah's work because he worked at IDC Resources in Pakistan.  Sohail Mot. at 18.  IDC Resources owner Faisal Aftab states that Jadoo's project team started at IDC Resources in 2014 and ended in 2019.  DISH Mot. Ex. 3 at 380:14–20.  During this time, Aftab did not oversee Shah's day to day operations, and Shah did not report to him on a regular basis.  DISH Opp'n Ex. 1 at 49:8–50:8; Sohail Mot. Ex. 12 (dkt. 243-12) at 236:6–17.  Instead, Shah and other Jadoo employees reported directly to Sohail, who was a "key figure" and "the main individual" with whom Shah communicated.[17]  DISH Mot. Ex. 3 at 380:21–381:8; DISH Opp'n Ex. 1 at 70:24–71:5, 109.  Shah and all other IDC Resources employees working for Jadoo were "de facto Jadoo employees," as IDC Resources is a co-working space "like WeWork[]" that also handles administrative tasks, such as payroll.  DISH Opp'n Ex. 1 at 51:20–52:15; 53:3–20.

Finally, Sohail states that he "was not in charge of content for JadooTV," and that IDC Resources—based in Pakistan—was "responsible for video-on-demand (VOD) and live channel monitoring for JadooTV."  Sohail Mot. Ex. 14 ¶ 18.  He also does not "recall instructing IDC Resources or the content team on what specific programs to make available on VOD."  Id. ¶ 20.  But these assertions do not create a genuine dispute that Sohail oversaw Shah.

Accordingly, because the evidence shows that Defendants violated the exclusive right to perform the Works via both enhancing users' access to the Works, and its agent uploading the SASP Works, there is no genuine dispute that Defendants violated DISH's exclusive right to

---

[17]  Sohail states, "I communicated with Mr. Malik and Mr. Shah approximately once a week, but they did not directly report to me. They reported to Mr. Aftab in IDC Resources."  Sohail Mot. Ex. 14 ¶ 18.  This statement does not create a genuine dispute.  As Aftab explains, while "there was no . . . direct reporting org chart in [Jadoo]," Shah and other employees would most frequently speak to Sohail.  DISH Opp'n Ex. 1 at 71:6–17.  While the term "direct report" might not have been used by Jadoo, Defendants do not contest that Sohail had significant oversight over Shah and other Jadoo employees housed at IDC Resources.

United States District Court
Northern District of California

perform the Works.

### 3.    Volition

To demonstrate volitional conduct where the defendant operates an automated, user-controlled system, the plaintiff must show that the defendant exercised control by either "select[ing] material for upload, download transmission or storage" or by "instigat[ing] any copying, storage or distribution of . . ." the copyrighted material.  Zillow, 918 F.3d at 732 (quoting Perfect 10, Inc. v. Giganews, Inc., 847 F.3d 657, 666, 670 (9th Cir. 2017)).

As noted, Jadoo "instigated . . . distribution" by enhancing users' access to the infringing content.  See supra Section III.A.2.a.  And Jadoo, through the actions of Shah, "selected . . . material for upload."  See supra Section III.A.2.b.  Accordingly, Defendants exercised control; their conduct was volitional.

### 4.    Sohail's Liability

The Court previously held that Sohail is personally liable if (1) his conduct satisfies the elements of direct, contributory, or vicarious infringement (what is known as the elemental approach), or (2) he authorizes, directs, or participates in direct, contributory, or vicarious infringement (the approach used in Comm. for Idaho's High Desert v. Yost, 92 F.3d 814 (9th Cir. 1996)).  See DISH, 2020 WL 5816579, at *3–4.  Courts that have applied the Yost standard in copyright cases have found that officers and directors are personally liable if they are the "guiding spirit" behind the infringement.  Bangkok Broad. & T.V. Co., v. IPTV Corp., 742 F. Supp. 2d 1101, 1114–15 (C.D. Cal. 2010) (quoting Davis v. Metro Prods., 885 F.2d 515, 524 n. 10 (9th Cir. 1989)).  It is proper to hold a director personally liable where they are the general manager, owner, and "principal decision-making authority as to responding to infringement notices."  Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc., No. C 07-03952 JW, 2010 WL 5598337, at *15 (N.D. Cal. Mar. 19, 2010), affirmed in part, vacated in part, and remanded by Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc., 658 F.3d 936 (9th Cir. 2011).  It is also proper to hold a director personally liable where the director is "the founder, president, and sole shareholder" of the company.  Coach Servs., Inc. v. Cielo Creations, Inc., No. CV 10-4108 GAF, 2011 WL 13217091, at *15 (C.D. Cal. Aug. 16, 2011).  Finally, directors are liable where they "are the active and

conscious force behind . . . [the] infringing products, not whether [they were] aware that the activity was infringing." Adobe Sys. Inc. v. Childers, No. 5:10-cv-03571-JF/HRL, 2011 WL 566812, at *7 (N.D. Cal. Feb. 14, 2011) (quoting Novel, Inc. v. Unicom Sales, Inc., No. C-03-2785 MMC, 2004 WL 1839117, at *17 (N.D. Cal. Aug. 17, 2004)).

Here, Sohail is personally liable as the director of Jadoo because he was the "guiding spirit" behind the infringement. See Bangkok, 742 F. Supp. 2d at 1114–15. He is liable because he was Jadoo's founder, CEO, director, and majority shareholder, and because he had the ability to unilaterally change company policy. DISH Mot. Ex. 2 at 148:1019; 191:1–24; 192:12–193:3; see Coach Servs., 2011 WL 13217091, at *15. Sohail was "the active and conscious force behind . . . [the] infringing products" even if he was unaware of the infringement prior to 2016. See Adobe, 2011 WL 566812, at *7. Indeed, Sohail states that he had "responsibility for" and "the final say in everything" at Jadoo, including customer support and content. DISH Mot. Ex. 2 at 155:16–20; 161:21–162:2; 289:12–13. For example, Sohail approved whether someone was hired for a senior position at Jadoo; he also controlled the engineering team led by Faisal Abdullah, head of engineering, and communicated with Abdullah weekly. Id. at 163:4–7; 167:13–20; 203:15–17; 287:13–19; 289:15–18. He exercised control over the contracted third party, Altair Technologies, that developed software to Jadoo's specifications.[18] Id. at 201:9–22; 204:22–205:2. Finally, Sohail is liable because he was the "principal decision-making authority as to responding to infringement notices" sent by DISH. See Louis Vuitton, 2010 WL 5598337, at *15; DISH Mot. Ex. 1 at 166:7–9.

Thus, there is no genuine dispute that DISH owned the copyrighted material, that Defendants violated DISH's exclusive right, that Defendants acted with volition, and that Sohail was personally liable as Jadoo's director. Accordingly, the Court GRANTS DISH's motion as to the direct infringement claim, and DENIES Sohail's motion as to this claim.

**B.      Contributory Copyright Infringement Under 17 U.S.C. Section 501**

DISH's second claim against Defendants is for contributory copyright infringement.

---

[18] Sohail founded Altair Technologies, and he is currently its CEO and majority shareholder. DISH Mot. Ex. 2 at 199:9–18; 200:4–8.

United States District Court
Northern District of California

Contributory infringement is a form of secondary liability that is only available when direct infringement by a third party has occurred.[19]  A&M Records, 239 F.3d at 1013 n.2.  For contributory liability generally, the Ninth Circuit has adopted the rule from Gershwin Publishing Corp. v. Columbia Artists Management, Inc., 443 F.2d 1159, 1162 (2d Cir. 1971).  Perfect 10, 508 F.3d at 1171.  The Gershwin rule states: "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer."  Id. (citing Gershwin, 443 F.2d at 1162).  The liability is "predicated upon 'the common law doctrine that one who knowingly participates or furthers a tortious act is jointly and severally liable with the prime tortfeasor.'"  Gershwin, 443 F.2d at 1162 (citation omitted).

Here, DISH argues that Defendants are liable for contributory infringement because they (1) materially contributed to the infringement, and (2) induced the infringement.  DISH Mot. at 11.  As noted, the Ninth Circuit held that contributory infringement can be established under either of these theories.  See Perfect 10, 508 F.3d at 1171 (citing Gershwin, 443 F.2d at 1162).  This order addresses each in turn.

### 1.    Material Contribution

DISH's first theory is that Jadoo materially contributed to the infringement.  In Amazon, the Ninth Circuit applied the Gershwin rule in the context of cyberspace, holding that a computer system operator can be held liable under a material contribution theory if two elements are met: (1) actual knowledge that specific infringing material is available using its system, and (2) the operator could take simple measures to prevent further infringement.  Amazon, 508 F.3d at 1172.  Ninth Circuit cases that discuss contributory infringement standards do not require the plaintiff to show that the operator can unilaterally implement the "simple measures."  See Amazon, 508 F.3d at 1172; Giganews, 847 F.3d at 671.  Instead, to be considered "simple measures," the measures

---

[19]  While Jadoo exclusively performed the SASP Works, Jadoo's users performed 18 Registered Works and 5 Unregistered Works that were not part of the SASP Works (though Jadoo also performed these Works because it enhanced users' access to view them).  See supra Section III.A.2.a; DISH Mot. Ex. 8 at 1458–59 ¶¶ 13–14, 17; 1791–1806 (Registered works at rows 248–72, Unregistered Works at rows 273–77).  Because a third party infringed, contributory infringement is available.

United States District Court
Northern District of California

1    must be not "onerous" or "unreasonably complicated."  Giganews, 847 F.3d at 671.

2          First, Jadoo was on notice no later than DISH's letter in 2016 that users were sharing

3    unlicensed content on the Service.  DISH Mot. Ex. 2 at 263:16–264:6 (Sohail stating that Jadoo

4    "knew that [unlicensed content was shared via the Service] once we were made aware of it, from

5    time far back I guess in 2016 when Dish made us aware").  Yet Jadoo continued to perform the

6    Works until August 2019.  See supra Section III.A.2.

7          Second, Jadoo could have taken simple measures to prevent further infringement.  DISH's

8    expert, Jones, determined that Jadoo could have implemented several "simple measures to block

9    the SASP."  DISH Mot. Ex. 7 at 1366.  He defines simple measures as "measures that were

10   reasonable and feasible, particularly as Jadoo had an entire engineering company at their

11   disposal."  Id.  Those simple measure include: not installing the eMedia player on STBs[20];

12   blocking the eMedia player in the U.S. based on IP based geolocation[21]; hosting the XML files on

13   Jadoo servers[22]; providing conditional access to XML files on Jadoo servers[23]; removing support

14   for token protection[24]; and filtering out copyrighted channels.[25]  Id. at 1366–71.  Defendants argue

15   in their unsworn pleading that these measures would not have been simple, but they provide no

16   explanation or evidence.  See Defendants Opp'n at 14 n.21.  Defendants' expert, Groves, only

17   contests the second measure by stating that Jones did not provide "enough evidence to suggest that

---

[20]  "This step, which was ultimately undertaken by Jadoo, simply prevents the eMedia player from being installed on the Jadoo STB."  DISH Mot. Ex. 7 at 1366.
[21]  Jones states that "[t]he Jadoo STB uses an IP lookup scheme to determine the location of the STB" and determined that he was in Maryland.  DISH Mot. Ex. 7 at 1366.  Jones provides that "it would be trivial for Jadoo to ship its STB without the eMedia player installed, and then only allow the eMedia player to be installed via the Internet if the user was not located in the USA."  Id. at 1377.
[22]  Instead of storing XML files on third-party servers, Jadoo could have stored the files on its own servers so that it "could simply delete XML files that pointed to copyright content."  DISH Mot. Ex. 7 at 1367.
[23]  If Jadoo hosted XML files on its servers, it could block or allow access to copyrighted content based upon the user's location.  DISH Mot. Ex. 7 at 1367–68.
[24]  Jadoo could have prevented users from watching token protected streams, such as CDNs. Jones explains that "[a] video stream being supplied by a CDN is a web URL just like any other URL on the Internet," but because bandwidth costs are high to stream videos, "the provider can use token protection to restrict who can watch a video to those that are authorized (e.g. by paying a subscription)."  DISH Mot. Ex. 7 at 1368.
[25]  While Jones states that this measure is imperfect and more work than the other measures, he nonetheless asserts that Jadoo's team "should have been able to filter out the SASP channels in a fraction of the time it took them to develop the eMedia player."  DISH Mot. Ex. 7 at 1370–71.

United States District Court
Northern District of California

Jadoo is able to receive location data for each STB," but she does not, nor does any other Defendant witness, contest that Jadoo could have taken any of the other measures to stop the infringement.  See Defendants Opp'n Ex. 20 at ¶¶ 23, 27.

After DISH notified Jadoo of the infringement in 2016, Sohail states that Jadoo did not take any action to stop the copyright infringement on eMedia and VOD because there was "nothing we could do."[26]  DISH Mot. Ex. 2 at 231:18–23.  Sohail states that Jadoo did remove infringing channels on LiveTV because it had control over them.  Defendants Opp'n Ex. 1 ¶ 62.

In 2018, after DISH brought the present action, Sohail states that the engineering team undertook the last measure offered by Jones when it developed a filter, but that this measure "had flaws."  Id. ¶ 63.  Sohail explains that Jadoo therefore "remove[d] the eMedia app from its set-top boxes and apps" in August 2019.  Id. ¶ 65.  Defendants do not explain why removing eMedia is not a "simple measure."  Instead, they say that it was a "difficult decision" and a "last resort" because of the service's popularity.  Id.  But that does not mean that it was not a simple measure to prevent infringement, and Jadoo nonetheless waited two and a half years after receiving notice to do it.  See id. ¶ 63.  Moreover, as Sohail explains, Jadoo only did so because DISH brought the present action.  See id.  Sohail admits that Jadoo could have taken the action it took in August 2019—removing eMedia—after receiving DISH's notice in 2016.  DISH Mot. Ex. 2 at 231:11–232:10.

There is no genuine dispute that Jadoo knew about the infringement and could have implemented several simple measures to prevent it.  Accordingly, Jadoo materially contributed to the infringement, and thus is liable for contributory infringement.

### 2. Inducement of Infringement

DISH's second, and separate, theory for contributory infringement is that Defendants induced infringement.  Inducement of infringement has four elements: (1) distribution of a product

---

[26] Sohail states that the engineering team told him that removing the infringing content from eMedia and VOD was "difficult and nearly impossible" because the content was stored on third-party servers and labeled by users, not Jadoo.  Defendants Opp'n Ex. 1 ¶¶ 59–61.  But Sohail does not address any of the measures outlined by Jones, including that Jadoo could have stored the XML files on its own servers so that it "could simply delete XML files that pointed to copyright content."  See DISH Mot. Ex. 7 at 1367.

United States District Court
Northern District of California

or service, (2) acts of infringement, (3) object of promoting the product or service to infringe a copyright, and (4) causation.  Fung, 710 F.3d at 1032.  The parties do not debate elements one, two, and four, which are clearly satisfied here: Jadoo distributed STBs for users to access the Service, Jadoo's users committed acts of infringement by uploading Works to the Service, and Jadoo's distributed product caused the infringement.  See id. at 1032, 1034, 1037; supra Section III.A; DISH Mot. Ex. 8 at 1458–59 ¶¶ 13–14, 17; 1791–1806 (Registered works at rows 248–72, Unregistered Works at rows 273–77).  However, the third element—object of promoting the product or service to infringe a copyright—is in dispute.

In Grokster, the Court provided several examples of evidence that tend to satisfy the third element.  MGM Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 938–41 (2005).  The "classic instance of inducement" occurs when a defendant advertises the product or service as a tool for infringement.  Id. at 937.  Here, Jadoo advertised eMedia as a tool for users to upload and watch content that was not licensed by Jadoo, including by displaying content on its website that Jadoo did not have license to show in the United States.  DISH Mot. Ex. 2 at 357 ("Calling Content Providers & Developers to Add Content to the Jadoo4 Box. Calling Users to Aggregate Content in One Easy Place."); Defendants Opp'n Ex. 1 ¶ 45.  DISH argues that this advertisement invited infringement.  DISH Mot. at 13.  Sohail contests this characterization, explaining that "JadooTV had one website that was available to viewers worldwide" and that "content shown on the website was content that JadooTV had licensing rights to show in various parts of the world."  Defendants Opp'n Ex. 1 ¶ 45.  Sohail offers a single example: "ARY was advertised on the site because although JadooTV could not show that material to U.S. audiences, it could show that material" elsewhere in the world.  Id.  But Defendants offer no evidence of their right to carry the additional content displayed on their website.  There are also emails showing that Sohail wanted to make ARY content available on the Service in the U.S., even though he acknowledged in those emails that DISH had the exclusive right to do so.  DISH Mot. Ex. 2 at 319–20.

Second, in Grokster, the Court found that defendants communicated an "inducing message" to their users by responding affirmatively to user requests for help in locating copyrighted material.  Grokster, 545 U.S. at 938.  While Jadoo had copyright infringement

policies on its website, it nonetheless affirmatively responded to requests from users to add unlicensed channels by telling them to "go on YouTube, search how to add channels on JadooTV, and there are four or five videos on YouTube."[27]  Defendants Opp'n Ex. 4 (dkt. 257-4); DISH Mot. Ex. 4 at 504:11–14.  Defendants argue that these responses were innocuous because they "was no discussion of the SASP or DISH's protected channels" in their communications with users.  Defendants Opp'n at 21.  But Defendants do not dispute that they in fact told customers to go to YouTube, knowing that customers would find "four or five videos" instructing them to add channels that Jadoo did not have license to show.  See DISH Mot. Ex. 4 at 504:11–14.

Third, in Grokster, the Court found proof of the purpose of inducing infringement where the defendant engaged in internal communications to that effect.  Grokster, 545 U.S. at 938. Sohail emailed Jadoo employees, informing them that major Indian channels had content available on YouTube that could be viewed through the Service in the U.S., even though he acknowledged that DISH had the exclusive right to broadcast the content domestically.  DISH Mot. Ex. 2 at 319– 20.  He nonetheless told employees to "look into this urgently and try to verify from content partners as well as seeing if they all will play on our platforms."  Id.  Moreover, Jadoo's customer support training manual includes instructions for users to integrate the eMedia channels and VOD into the LiveTV and VOD sections of the Service, and to search YouTube for instructions on how to add channels.  Id. at 339–46.  Jadoo's customer support log also shows that Jadoo employees helped users find eMedia URLs by guiding them to YouTube videos.  Id. at 1033–37.

Collectively, these factors demonstrate that Jadoo induced infringement.  But even if the Court accepted Jadoo's arguments that its advertisement, customer service, and internal communications were all compliant, Jadoo nonetheless induced infringement because it clearly fits the last Grokster factor: failing to "develop filtering tools or other mechanisms to diminish the infringing activity using their software."  See Grokster, 545 U.S. at 939.  When DISH notified Jadoo of infringing content on eMedia in 2016, Jadoo did nothing to limit it, and when the present action was filed in November 2018, Jadoo still waited until August 2019 to take the simple

---

[27]  There is no evidence indicating that Defendants created these videos.

1   measure of removing eMedia.  See supra Section III.B.1.  Because Jadoo did nothing for over two

2   and a half years to "diminish the infringing activity," it induced infringement.  See Grokster, 545

3   U.S. at 939.

4        There is no genuine dispute that Jadoo both materially contributed to and induced

5   infringement.  Because Sohail was the "guiding spirit" behind the infringement, he is also liable.

6   See supra Section III.A.4.  Accordingly, the Court GRANTS DISH's motion as to this claim, and

7   DENIES Sohail's motion as to this claim.

8       **C.**    **Vicarious Copyright Infringement Under 17 U.S.C. Section 501**

9        DISH's third claim against Defendants is for vicarious copyright infringement.  Vicarious

10  copyright liability requires a showing that the defendant (1) received a direct financial benefit

11  from the infringement, while (2) declining to exercise a right and ability to control it.  Amazon,

12  508 F.3d at 1173, 1176.

13      **1.**    **Direct Financial Benefit**

14       Financial benefit exists where the availability of infringing material acts as a draw for

15  customers.  Ellison v. Robertson, 357 F.3d 1072, 1078 (9th Cir. 2004).  The plaintiff need not

16  show that a "substantial" proportion of a defendant's income is directly linked to infringing

17  activities.  Id.  "The essential aspect of the 'direct financial benefit' inquiry is whether there is a

18  causal relationship between the infringing activity and any financial benefit a defendant reaps."

19  Id. at 1079.

20       Here, DISH's expert witness, Susan Thompson, calculates that Jadoo generated

21  $11,594,702 in revenue from the Works.  DISH Mot. Ex. 9 (dkt. 242-9) at 1849.  Thompson states

22  that because "Jadoo does not track its costs by channel, language, or geographical region," she did

23  not deduct expenses that would reduce Jadoo's gross revenues.  Id.  Defendants' rebuttal expert,

24  Petra Loer, calculated that Jadoo generated $7,882,416 in revenue from the Works.[28]  Defendants

25

26  [28]  Both experts agree that 66% of Jadoo's total U.S. sales are related to the Works.  See
    Defendants Opp'n Ex. 22 (dkt. 257-22) at 4; DISH Mot. Ex. 9 at 1848.  Loer's calculated revenue
27  is lower because she "removed revenue related to Advertising," finding it "unrelated" to the
    Works.  Defendants Opp'n Ex. 22 at 2.  Loer also calculated Jadoo's Deductible Expenses—cost
    of goods sold, sales and marketing, research and development, and general and administrative
28  expenses—at $8,776,389.  Id. at 2, 5.  Defendants, therefore, state that no profits are attributable to

United States District Court
Northern District of California

Opp'n Ex. 22 at 2.  In finding a financial benefit, the Court need not determine exactly how much revenue is attributable to the Works.  Rather, the Court need only find that "there is a causal relationship between the infringing activity and <u>any</u> financial benefit a defendant reaps."  <u>See</u> <u>Ellison</u>, 357 F.3d at 1079 (emphasis added).  The expert witness calculations show that Jadoo financially benefited from infringing the Works.  And as Jadoo's salaried CEO and majority shareholder, Sohail also directly benefited from the infringement.  <u>See</u> DISH Mot. Ex. 2 18 ¶ 36; 148:10–19; 191:15–192:8.

Sohail states that "JadooTV had no economic incentive to encourage viewing of purportedly protected content, because JadooTV did not charge users for viewing the third-party content nor did JadooTV generate any advertising revenue from users viewing the bookmarked VOD content."  Sohail Mot. Ex. 14 ¶ 29.  But Thompson states that Jadoo's "advertising revenue is properly included in the profits of Defendants attributable to their copyright infringement because" Jadoo was "generating ad revenue by providing consumer information that can be monetized," and Jadoo attracted additional consumers to its STBs because of the Works.  DISH Mot. Ex. 9 at 1834 ¶ 5.  Defendants do not contest that the infringement attracted additional users to buy STBs and use the Service, which is why both experts conclude that Jadoo generated millions of dollars in revenue by offering the Works.  DISH Mot. Ex. 9 at 1849; Defendants Opp'n Ex. 22 at 2.

Defendants also do not dispute other facts that demonstrate that Jadoo financially benefited from the Works.  After Jadoo removed eMedia channels in April 2019, resellers of STBs complained and returned boxes.  DISH Mot. Ex. 4 at 491:5–7; 506:14–507:10.  Users called Jadoo to complain about the blocked eMedia channels.  <u>Id.</u> at 508:12–509:12.  Indeed, Jadoo's Customer Support Log for the period February 15, 2019 through December 31, 2019 shows that the company received 11,900 user complaints regarding the filtering or removal of content.  <u>Id.</u> Ex. 2 at 24–25 ¶ 35(c).  Overall, U.S. sales from Jadoo STBs declined by 79.7% from 2018 to 2019—

---

the Works because its calculated Deductible Expenses are greater than its calculated revenue. Defendants Opp'n at 24.

after the infringing content was removed.[29]  Id. Ex. 9 at 1835 ¶ 7.

Finally, Sohail states that Jadoo offered "approximately 800" channels and that VOD "contained over 200,000 hours of television shows and music videos."  Defendants Opp'n Ex. 1 ¶ 35.  He further calculates that the Works "were a mere 6% of the 200,000 hours of content" and that the Protected Channels were "2-4%" of the channels Jadoo offered.  Id. ¶ 68.  As DISH points out, "Sohail does not identify the alleged channels or works, whether such content was licensed, whether such content was available at the time the Works were infringed, or even attempt to explain how these numbers were calculated."  See DISH Reply at 14.  Sohail also does not explain why his calculations demonstrate that Jadoo did not financially benefit from the Works.  Even if DISH's content was a small percentage of Jadoo's offerings, Defendants do not contest that the infringement provided some financial benefit, which is all that is needed to find Defendants liable for vicarious infringement.  See Ellison, 357 F.3d at 1079.  Sohail's statement, therefore, does not create a genuine dispute of fact, and the only evidence offered—including evidence from Defendants' expert—unequivocally demonstrates that Jadoo profited from the infringement.

## 2.    Right to Stop or Limit Infringement

To satisfy the second element of vicarious liability, the defendant must have the "legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so."  Amazon, 508 F.3d at 1173.

Here, Defendants clearly had the "legal right" and "practical ability" to "stop or limit the directly infringing conduct" because Jadoo ultimately did stop the infringement by removing eMedia.  See id.; Sohail Mot. Ex. 14 ¶ 32.  Sohail personally had the ability and right to stop the infringement because—as Jadoo's founder, CEO, director, and majority shareholder—he states that he could unilaterally change company policy.  DISH Mot. Ex. 2 at 148:10–19; 191:1–193:3.

---

[29]  Sohail states that Jadoo's sales declined to the point where the company declared bankruptcy because of "DISH's lawsuit and the subpoenas that DISH sent to most of our resellers. The businesses that buy JadooTV set top boxes to resell tend to be small mom-and-pop shops. It was conveyed to me that they were intimidated by DISH and scared to continue to do business with JadooTV."  Sohail Mot. Ex. 14 ¶ 33.  This statement does not create a genuine dispute because it also demonstrates that Jadoo's sales decreased because of the infringement and the legal actions that DISH took to protect its exclusive right to perform.

United States District Court
Northern District of California

Sohail stated that he had "responsibility for" and "the final say in everything" at Jadoo. Id. at 155:16–20; 161:21–162:2; 289:12–13. Sohail approved Jadoo's responses to the copyright infringement notices that Jadoo received. Id. Ex. 1 at 166:7–9. Sohail had previously removed channels from Jadoo. DISH Opp'n Ex. 1 at 8:23–25. Yet Sohail did not prevent users from being able to access the unlicensed material on eMedia until August 2019. Id. at 11:10–23. Indeed, Sohail admits that Jadoo could have taken the action it finally took then—removing eMedia—after receiving DISH's first notice in 2016. DISH Mot. Ex. 2 at 231:11–232:10. And as previously discussed, Jadoo could have taken other simple measures to prevent infringement. See supra Section III.B.1.

Because there was a direct financial benefit, and Defendants had the right to stop or limit infringement, they are liable for vicarious infringement. The Court, therefore, GRANTS DISH's motion as to this claim, and DENIES Sohail's motion as to this claim.

Accordingly, DISH is entitled to summary judgment as to all of its claims. The Court need not address DISH's remaining arguments that Magistrate Judge Beeler's order providing DISH a permissive adverse-inference jury instruction precludes summary judgment in Sohail's favor, and that other statements in the declarations from Sohail and Ahsan Salahuddin (Jadoo's former VP of Sales) lack personal knowledge, are inadmissible hearsay, and improperly introduce consultations with counsel. See DISH Opp'n at 11–14; Sohail Reply at 7–9. Resolving those questions would not change the Court's holding because, even when accounting for the declaration statements and the possibility of granting summary judgment to Sohail, the Court still concludes that DISH is entitled to summary judgment as to all claims.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS DISH's motion for summary judgment as to all claims, and DENIES Sohail's motion as to all claims. The Court dismisses as moot DISH's motions to exclude the rebuttal testimony of Groves and Loer.

The Court further DIRECTS the parties to submit a joint filing, within forty-five days of this order, on the subject of what relief the Court should provide to DISH in light of the summary judgment ruling. DISH argues that it is entitled to statutory damages, Jadoo's profits, attorneys'

fees, and a permanent injunction.  See DISH Mot. at 21–25.  Defendants contest each of these forms of relief.  See Defendants Opp'n at 24–25.  Additional briefing should address at least three issues.  First, DISH seeks statutory damages only for the Registered Works, and asks for Jadoo's profits only for the Unregistered Works.  See DISH Mot. at 21–24.  If DISH's request is legally feasible, the Court needs to know how it would determine Jadoo's profits attributable only to the Unregistered Works.  The parties should propose how these calculations should be made.  Second, the parties' experts dispute what expenses can be deducted from Jadoo's profits, but they do so in little detail.  See Defendants Opp'n Ex. 22 at 2, 5; DISH Mot. Ex. 9 at 1849.  Additional briefing, including citations to relevant caselaw, would be helpful.  Finally, because both parties agree that the infringement ended in 2019, see DISH Mot. Ex. 8 at 1457 ¶ 11; Sohail Mot. Ex. 14 ¶ 32, it is unclear that a permanent injunction is appropriate.  The parties do not adequately address this question, and should do so in further briefing.

**IT IS SO ORDERED.**

Dated: June _13_, 2023

CHARLES R. BREYER
United States District Judge

United States District Court
Northern District of California

28